741 A.2d 624 (1999)
326 N.J. Super. 417
STATE of New Jersey, Plaintiff-Respondent,
v.
Dennis COPLING, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted September 15, 1999.
Decided December 16, 1999.
*627 Ivelisse Torres, Public Defender, for defendant-appellant (Susan Brody, Assistant Deputy Public Defender, of counsel and on the brief).
John J. Farmer, Jr., Attorney General, for plaintiff-respondent (Michael J. Williams, Deputy Attorney General, of counsel and on the brief).
Before Judges KLEINER, CARCHMAN, and LEFELT. *625
*626 The opinion of the court was delivered by
KLEINER, J.A.D.
Defendant Dennis L. Copling was convicted by a jury of first-degree conspiracy to commit murder, N.J.S.A. 2C:5-2 and N.J.S.A. 2C:11-3(a) (count one); first-degree murder of Kirby Bunch, N.J.S.A. 2C:11-3(a) (count two); aggravated manslaughter as a lesser-included offense of the murder of Mark Winston (hereinafter "Malik") pursuant to the indictment charging murder, N.J.S.A. 2C:11-3(a) (count three); second-degree possession of a weapon for an unlawful purpose, N.J.S.A. 2C:39-4(a) (count four); and third-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5(b) (count five).
At sentencing, the trial judge merged defendant's convictions on counts one and four into his conviction on count three and sentenced defendant to a custodial term of life imprisonment with a thirty-year period of parole ineligibility. On count two, the judge sentenced defendant to a concurrent custodial term of thirty years with a fifteen-year period of parole ineligibility. On count five, defendant was sentenced to a custodial term of imprisonment of five years with two-and-one-half years of parole ineligibility to be served consecutively with the sentence imposed on count three. Appropriate statutory penalties were also imposed.

I.
Defendant did not testify at trial nor did he present any witnesses in his defense. We will briefly review the State's evidence.
Lakesha Buckhannon (hereinafter "Lakesha") lived with her mother in Camden. Lakesha's older half-brother, Kirby Bunch (known as and hereafter referred to as "K.C."), lived nearby. Lakesha received a puppy as a Christmas present in 1994, and her friend, Gary Copling (hereinafter "Gary"), defendant's younger brother, *628 offered to help walk and train the puppy.
On January 17, 1995, Gary took the dog to his home, but when Lakesha stopped at the Copling residence to retrieve the dog, Gary said he did not have it. Lakesha was upset and believed Gary was lying to her, so she called her brother K.C. Lakesha told K.C. what had happened with the dog then she, K.C., their cousin, Latisha Fair (hereinafter "Latisha"), and K.C.'s friend, Nate Simmons (hereinafter "Nate"), drove around the neighborhood looking for Gary. When they found him at a friend's house, K.C. hit Gary with a bottle and then began to punch, kick, and choke him. Eventually, Nate pulled K.C. off of Gary, and Gary fled.
The next day, Lakesha, her mother, and Latisha were at the home of a friend when defendant, Gary's older brother, arrived. Defendant had learned that K.C. had beaten Gary the previous evening. Defendant demanded to know K.C.'s whereabouts. Defendant kept repeating that he was going to "get" K.C. Defendant also stated that he was going to find K.C. and kill him. Because defendant was visibly upset, Lakesha's mother called the police. The police arrived, but did not take any action. Thus, Lakesha and Latisha left their friend's house to find K.C. and warn him about defendant.
That evening, K.C. was at Nate's apartment. A mutual friend, Benjamin Young (hereinafter "Ben"), was also visiting. According to the testimony of Nate and Ben, Malik arrived at the apartment upset and angry, wanting to know why the three men had jumped Gary the previous night. Nate told Malik that the three men had not jumped or beaten Gary. Malik then said they "well, you're going to speak with [Gary's] brother." K.C. and Malik then walked into the kitchen together.
Nate testified that he was sitting in the living room when K.C. and Malik entered the kitchen. Nate saw another man enter the kitchen through the back door of the apartment. The man was wearing a foam rubber half-mask over the lower half of his face. Nate described the man as about 6'2", well built, and wearing a black and white jacket, a black hooded sweatshirt with the hood pulled up, a black sweater, and dark green pants. Nate testified that the man said, "Why you jump my brother?" and pulled a black automatic handgun from his jacket pocket. K.C. was standing in front of Malik and grabbed for the gun. Both Nate and Ben heard a gunshot and started to run. As they fled, they heard between three and five more gunshots. Nate further testified that the man in the mask matched the height and build of defendant.
Timothy Queensberry, a neighbor, testified that he was at home that same evening and heard gunshots and a voice shouting that he recognized as K.C.'s. After hearing the commotion, Queensberry walked outside and saw K.C. lying on the ground, calling for help. Queensberry could tell that K.C. had been shot and asked who had shot him, to which K.C. replied, "Dennis," obviously referring to defendant. As Queensberry was aiding K.C., a car stopped momentarily across the street and then drove away. Then a man, described as about 5'6" tall and "kind of built", ran to Queensberry and K.C., pulled a black 9-millimeter handgun from his waist, and shot K.C. once in the neck. The man then fled, firing shots behind him, but failing to hit anyone. Queensberry testified that the man he saw shoot K.C. in the head was not defendant, whom Queensberry knew.
The police arrived and found K.C. dead on the ground outside the apartment. The police found Malik in the kitchen, still alive but suffering from gunshot wounds. A loaded 9-millimeter handgun, containing seven rounds of live ammunition with one round still in the chamber, was found on the floor in the kitchen. The emergency medical personnel transported both victims to the hospital where K.C. was pronounced *629 dead, and Malik subsequently died.
The autopsy indicated that K.C. had been shot three times: in the back of the neck, the middle of his back, and his lower left side. The gunshot to the neck had been fired from a distance greater than eighteen inches. The other two gunshots to his torso were "contact" wounds, resulting from the gun being placed directly on his body. Neither the shot to the neck nor to the lower left side would have been independently fatal; however, the shot to his back alone would have been likely to cause death. The reported cause of death was the combined effect of the three gunshot wounds.
The autopsy performed on Malik revealed that he had been shot twice, in his back and thumb. The wound to his back was fired from a distance and caused his death.
One bullet was recovered from each victim's body. Two spent 9-millimeter shell casings were found at the scene, one on the kitchen floor and one outside the apartment. A third 9-millimeter shell casing was found by a neighbor and turned over to the police. The State Police laboratory determined that all three shells were fired from the same weapon, but that none of the shells could have been fired from the gun found at the scene on the kitchen floor.
On January 27, 1995, the police arrested defendant for killing K.C. and Malik. Defendant was provided with Miranda[1] warnings. At first, defendant maintained that he was unaware of the deaths of the two victims. However, later in the interview with the police at the prosecutor's office, defendant admitted that he had gone with Malik and Donne Parker, known as "Fahim" on the evening of January 18, 1995, to find K.C. at Nate's apartment and fight with him. Fahim waited in the car while Malik and defendant walked up to the apartment. Defendant waited outside while Malik entered the apartment. Defendant had instructions from Malik to fetch Fahim if any problems developed. Inside the apartment, Malik and K.C. began to exchange heated words, so defendant ran back to the car to summon Fahim. Defendant stated that he fled from the apartment, but Fahim entered the apartment and shot at K.C. According to defendant's oral statement, as he was running, he heard shots, looked behind him, and saw K.C. lying on the ground with Fahim standing over him and shooting at him. The oral interview was interrupted when defendant's family arrived at the prosecutor's office. A formal written statement was never prepared.
At trial, Leervin Hill testified that on the evening of the crime, he saw defendant pacing and cursing on the street. Defendant approached Hill, took a black foam rubber half-mask from around Hill's neck, and walked away with the mask. Both Lakesha and Latisha testified that they had seen defendant with a handgun prior to the killings.
At trial, the State contended that defendant fired two shots at K.C. in the kitchen and that Fahim, acting as an accomplice and using the same gun, returned and shot K.C. once in the neck outside the apartment. The State further contended that the doctrine of transferred intent holds defendant culpable for murdering Malik because the shot that killed Malik was intended to kill K.C.

II.
On appeal, defendant raises six points of error:
POINT I
THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY ON THE DEFENSE OF PASSION/PROVOCATION MANSLAUGHTER DEPRIVED DEFENDANT OF A FAIR TRIAL. (Not Raised Below.)
POINT II

*630 THE COURT'S FAILURE TO INSTRUCT THE JURY OF THE STATE'S OBLIGATION TO PROVE IDENTIFICATION BEYOND A REASONABLE DOUBT DEPRIVED DEFENDANT OF HIS RIGHT TO A FAIR TRIAL. (Not Raised Below.)
POINT III
BECAUSE THE PROSECUTOR WAS WRONGLY PERMITTED TO ELICIT TESTIMONY ABOUT A PRIOR INCIDENT INVOLVING DEFENDANT'S POSSESSION OF A GUN, DEFENDANT WAS DEPRIVED OF HIS RIGHT TO DUE PROCESS AND A FAIR TRIAL.
POINT IV
THE COURT'S REFUSAL TO HONOR DEFENDANT'S PRETRIAL REQUEST FOR AN ADJOURNMENT AND FOR REMOVAL OF HIS TRIAL COUNSEL BECAUSE OF A CONFLICT OF INTEREST DEPRIVED DEFENDANT OF A FAIR TRIAL.
POINT V
IN IMPOSING THE MAXIMUM TERM OF LIFE ON THE MURDER CHARGE, THE COURT FAILED TO GIVE ADEQUATE WEIGHT TO DEFENDANT'S LACK OF A PRIOR CRIMINAL RECORD AS A MITIGATING FACTOR.
POINT VI
THERE WAS NO ADEQUATE LEGAL BASIS FOR THE COURT'S IMPOSITION OF A CONSECUTIVE TERM FOR THE CHARGE OF UNLAWFUL POSSESSION OF A HANDGUN.

III.
Defendant contends, but did not raise below, that because the trial judge erred by failing to instruct the jury to consider passion-provocation manslaughter as a lesser-included offense to murder, his conviction must be reversed. Defendant argues that he was provoked by the attack on his younger brother and inflamed just before the shooting.
The State notes that defendant failed to raise this issue before the trial judge, yet Rule 1:7-2 obligates him to do so to preserve the question for appeal. Thus, this court must address the issue as one of plain error clearly capable of producing an unjust verdict. See R. 2:10-2; State v. Cooper, 151 N.J. 326, 385, 700 A.2d 306 (1997). Under the plain error standard, the issue is whether the failure to instruct the jury as to passion-provocation manslaughter created a possibility of injustice sufficient to raise a reasonable doubt as to the propriety of the jury's conviction. See State v. Oliver, 316 N.J.Super. 592, 596, 720 A.2d 1001 (App.Div.1998), certif. granted, 158 N.J. 74, 726 A.2d 937 (1999); State v. Macon, 57 N.J. 325, 336, 273 A.2d 1 (1971).
Passion-provocation manslaughter mitigates a murder conviction to manslaughter if the killing was "committed in the heat of passion resulting from a reasonable provocation." N.J.S.A. 2C:11-4(b)(2). In order to receive a jury instruction on passion-provocation manslaughter, the evidence must satisfy four elements: (1) the provocation was adequate to inflame a reasonable person; (2) the defendant did not have time to cool off between the provocation and the killing; (3) the provocation actually impassioned the defendant; and (4) the defendant did not, in fact, cool off before the killing. State v. Mauricio, 117 N.J. 402, 411, 568 A.2d 879 (1990) (citation omitted). The first two elements are objective; the second two are subjective and usually determined by the jury. Id. at 411-13, 568 A.2d 879.
The threshold for a jury instruction for passion-provocation manslaughter is relatively low. The defendant need only show "a rational basis for a verdict convicting the defendant" of the lesser-included offense. See N.J.S.A. 2C:1-8(e). However, the judge will not so instruct the jury if the evidence is "so weak as to preclude *631 jury consideration." State v. Crisantos, 102 N.J. 265, 275, 508 A.2d 167 (1986) (citing State v. Sinclair, 49 N.J. 525, 540, 231 A.2d 565 (1967)). Thus, if the evidence leaves room for dispute, the jury should be charged on passion-provocation manslaughter as a lesser included offense to murder, even if there is a reasonable basis to reject that charge. State v. Perry, 124 N.J. 128, 160, 590 A.2d 624 (1991) (citing State v. Pitts, 116 N.J. 580, 618-19, 562 A.2d 1320 (1989)). Here, the evidence presented at trial failed to prove the elements of passion-provocation manslaughter and failed to establish a rational basis for a jury instruction.
The first element of passion-provocation manslaughter requires an objective showing of adequate provocation. The provocation must be sufficiently extreme so as to cause a reasonable person to lose "mastery of his [or her] understanding...." State v. Pratt, 226 N.J.Super. 307, 317, 544 A.2d 392 (App.Div.), certif. denied, 114 N.J. 314, 554 A.2d 864 (1988).
The question of whether the provocation is adequate essentially amounts to whether loss of self-control is a reasonable reaction. When deciding whether to instruct a jury on passion/provocation manslaughter, a trial court should view the situation in the light most favorable to the defendant. If no jury could rationally conclude that the State had not proven beyond a reasonable doubt that the asserted provocation was insufficient to inflame the passions of a reasonable person, the trial court should withhold the charge.
[Mauricio, supra, 117 N.J. at 412, 568 A.2d 879.]
The alleged provocation was the attack on defendant's young brother. Defendant was not present during the attack; he merely heard about the attack the next day. Evidence was presented that upon learning of the attack of his younger brother, defendant telephoned his mother, who confirmed the prior evening attack but also assured defendant that his younger brother Gary was not injured.
A person can be provoked by conduct that causes injury to a relative. State v. Coyle, 119 N.J. 194, 225, 574 A.2d 951 (1990) (citing State v. Bishop, 225 N.J.Super. 596, 543 A.2d 105 (App.Div.1988)). In Bishop, the defendant witnessed his nephew being violently attacked. 225 N.J.Super. at 598, 543 A.2d 105. The defendant joined the fight, and in the process killed the victim. Id. at 598-99, 543 A.2d 105. This entitled the defendant to a jury instruction on passion-provocation manslaughter. Id. at 605, 543 A.2d 105.
Further, a person can be provoked without actually witnessing the provoking assault on the relative. See Coyle, supra, 119 N.J. at 226, 574 A.2d 951 (citing Commonwealth v. Berry, 461 Pa. 233, 336 A.2d 262, 265 (1975); W. LaFave & A. Scott, Criminal Law § 7.10, at 657-58 (2d ed.1986) (noting that words conveying information of a fact that would constitute adequate provocation had that fact been observed constitutes sufficient provocation)).
In addition, "mutual combat under certain circumstances could constitute adequate provocation to reduce murder to manslaughter ..." however, the dispute must have been fought on equal terms. Crisantos, supra, 102 N.J. at 274, 508 A.2d 167 (citation omitted). Thus, where there is voluntary combat, if the defendant alone is armed and takes unfair advantage of the victim, the offense is murder rather than passion-provocation manslaughter. Id. at 274-75, 508 A.2d 167.
Here, defendant's younger brother was beaten by K.C. If defendant were present at that fight, his passion would undoubtably have been inflamed. Learning about the attack the next day probably impassioned defendant just as if he were present to witness the attack. However, defendant learned that his brother was uninjured. Thus, objectively, defendant's response to the provoking incident was *632 unreasonable. Defendant's younger brother and K.C. engaged in a fist fight; if defendant had been present at the fist fight, armed with a handgun, and joined the fist fight with a gun, it would not be characterized as mutual combat. See id. at 274, 508 A.2d 167. As such, defendant's actions the following day are no more justifiable under the mutual combat rule. It is clear that defendant took unfair advantage of K.C. and killed him not out of passion or provocation, but in retaliation.
Defendant notes that K.C. may have been armed at the time of the killings; however, the combat that would constitute the provoking incident was the fist fight between K.C. and defendant's brother the prior evening, not the incident that immediately preceded the killings. The provocation in this case was insufficient to cause a reasonable person to lose self-control so as to reduce the murder to manslaughter. Mauricio, supra, 117 N.J. at 412, 568 A.2d 879.
The second element of passion-provocation manslaughter is that the time between the provoking incident and the killing was an insufficient period for a reasonable person to cool off. Defendant found out about the attack on his brother "at some point the following day or evening." It is clear from the record that defendant was aware of the attack at around 6:00 p.m. The shooting took place at about 8:30 p.m. While a reasonable person would be enraged upon discovering that his or her little brother had been violently attacked, objectively, it was not error for the trial judge to conclude that defendant's passion would abate in two-and-a-half hours, particularly when defendant was specifically informed that his brother, though attacked, was not injured. Stated otherwise, the emotions that might linger several hours after the discovery of such news would be insufficient to cause a reasonable person to lose "mastery of his [or her] understanding...." Pratt, supra, 226 N.J.Super. at 317, 544 A.2d 392. Because a reasonable person would cool off in two-and-a-half hours after discovering that their brother had been attacked, the facts of this case do not satisfy the second element of passion-provocation manslaughter. Thus, the trial judge did not err in refusing to give the charge.

IV.
Although not raised at trial, defendant contends on appeal that the State failed to prove beyond a reasonable doubt that he was the masked man who shot the two victims. Defendant contends that he was entitled to have the jury specifically instructed as to the State's obligation to prove identification beyond a reasonable doubt. Because defendant failed to raise this issue before the trial judge, as required by Rule 1:7-2, this court must address the issue as one of plain error clearly capable of producing an unjust result. See R. 2:10-2; State v. Cooper, supra, 151 N.J. at 385, 700 A.2d 306. As stated previously, under the plain error standard, the issue is whether the failure to instruct the jury as to identification created a possibility of injustice sufficient to raise a reasonable doubt as to the propriety of the jury's conviction. State v. Oliver, supra, 316 N.J.Super. at 596, 720 A.2d 1001; State v. Macon, supra, 57 N.J. at 336, 273 A.2d 1.
A specific instruction regarding identification is required when that issue is essential to a case. See State v. Green, 86 N.J. 281, 290, 430 A.2d 914 (1981). To support his contention, defendant cites State v. Frey, 194 N.J.Super. 326, 476 A.2d 884 (App.Div.1984), where the eyewitness did not have an opportunity to see the perpetrator well. In Frey, we determined that, although the judge instructed the jury that the State had the burden of proving that the defendant was the assailant, and defense counsel failed to object to the charge, the omission of a complete and specific identification charge was reversible error. Id. at 329-30, 476 A.2d 884.
As part of an identification charge, the trial judge must inform the jury that *633 the State's case relies on an eyewitness identification of the defendant as the perpetrator. The jury must also be informed that in weighing the reliability of that identification, the "jury should consider, among other things, `the capacity or the ability of the witness to make observations or perceptions ... at the time and under all of the attendant circumstances for seeing that which he says he saw or that which he says he perceived with regard to his identification.'" State v. Cromedy, 158 N.J. 112, 128, 727 A.2d 457 (1999) (citing State v. Green, supra, 86 N.J. at 293-94, 430 A.2d 914).
Here, although the evidence of defendant's identity as the perpetrator was circumstantial, the evidence as a whole created strong inferences. Defendant was seen dressed entirely in black on the day of the killings and he took Leervin Hill's mask. Thereafter, defendant met with a group of people, including Latisha and Lakesha, and told them that he was looking for K.C. and was going to kill him. When Malik entered Nate's apartment just prior to the killings, and questioned K.C. and the others about the attack upon Gary the preceding evening, K.C. disavowed any involvement. Malik replied that they were going to speak to Gary's older brother. Almost immediately thereafter, the masked man, who fit the body type of defendant and was dressed in black with dark green pants, entered the apartment and asked K.C. why he had jumped his brother. After the shootings, K.C., while lying on the ground and wounded, told the neighbor that "Dennis" had shot him. In his unrecorded statement to the prosecutor and the police, defendant admitted that he, Malik, and Fahim went to Nate's apartment looking for K.C., and admitted that he had been dressed in black clothes and a ski mask. In total, the physical description, the clothes, the ski mask,[2] and the defendant's oral statements, including his asking K.C. why he had jumped his brother, clearly implicated defendant. Moreover, the identification of defendant did not rest solely on a single eyewitness, unlike that in Green, supra, 86 N.J. at 291, 430 A.2d 914.
The judge instructed the jury that the State must prove all elements of the crimes beyond a reasonable doubt, and that the defendant was not obligated to prove anything. The judge instructed the jury that in order to find defendant guilty of murder, they must find, beyond a reasonable doubt, that defendant caused the deaths of K.C. and Malik, and did so purposely or knowingly.
Defendant argues that because the identification charge was not given to the jury, "there is no way to dispel the possibility that the jury, although not convinced beyond a reasonable doubt that [defendant] was at the scene, nonetheless convicted him because it erroneously believed that he had the obligation to prove that the perpetrator had been someone else." However, defendant's identification, although obviously an important aspect of the case, was not an essential, contested issue. The State did not rely exclusively upon a single eyewitness to provide evidence of the perpetrator's identity. Nor did the defendant rely on misidentification in his defense. Given the strength and sources of the circumstantial evidence, the issue of identification was not a key issue. Thus, a jury instruction specifically on identification was unwarranted. Although it may be better practice for a trial judge to give an identification charge in every case where identification is even a remote issue, it is abundantly clear that the failure to do so in this case did not constitute plain error, and if there was error, it clearly was harmless under the factual circumstances of this case.

*634 V.
When the police were questioning defendant after his arrest, he stated that, although he and his friends drove to Nate's apartment on the night of the killings looking to fight K.C., he did not bring a gun. He also stated he was surprised that Fahim had a gun. At trial, the State elicited testimony from Lakesha and Latisha that, on a prior occasion, they had seen defendant with a gun. Defendant contends that his exculpatory statement to the police, that he was not in possession of a gun on the night of the killings, was undermined by the allegedly improper admission of other-crimes testimony, N.J.R.E. 404(b), that he had been in possession of a gun on a prior occasion. The error, defendant argues, is "of constitutional dimension, mandating reversal of [defendant's] conviction."
A ruling under N.J.R.E. 404(b), regarding whether to admit "other-crimes" evidence, is reviewed under the abuse of discretion standard. State v. Covell, 157 N.J. 554, 564, 725 A.2d 675 (1999) (citing State v. Ramseur, 106 N.J. 123, 266, 524 A.2d 188 (1987); State v. DiFrisco, 137 N.J. 434, 496, 645 A.2d 734 (1994), cert. denied, 516 U.S. 1129, 116 S.Ct. 949, 133 L.Ed.2d 873 (1996)). The trial courts are accorded broad discretion in admitting evidence pursuant to the Rule 403 balancing test. DiFrisco, supra, 137 N.J. at 496, 645 A.2d 734; see also State v. Erazo, 126 N.J. 112, 131, 594 A.2d 232 (1991). Covell instructs that "[o]nly where there is a `clear error of judgment' should the `trial court's conclusion with respect to that balancing test' be disturbed." 157 N.J. at 564, 725 A.2d 675 (citations omitted).
N.J.R.E. 404(b) provides:
Evidence of other crimes, wrongs, or acts is not admissible to prove the disposition of a person in order to show that he acted in conformity therewith. Such evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident when such matters are relevant to a material issue in dispute.
The rationale behind Rule 404(b) is to limit the use of other crimes to prevent the jury from convicting the defendant because he or she is in general a "bad" person, rather than because the defendant is in fact guilty of the crime charged. State v. Cofield, 127 N.J. 328, 336, 605 A.2d 230 (1992). Evidence of other-crimes tends to be prejudicial and, as such, Rule 404(b) is a rule of exclusion designed to avoid the inference that defendant has a propensity toward criminal acts. State v. Nance, 148 N.J. 376, 386, 689 A.2d 1351 (1997) (citations omitted).
Cofield provides a four-prong test for the admissibility of other-crimes evidence:
1. the evidence of the other crime must be admissible as relevant to a material issue;
2. it must be similar in kind and reasonably close in time to the offense charged;
3. the evidence of the other crime must be clear and convincing; and
4. the probative value of the evidence must not be outweighed by its apparent prejudice.
[Cofield, supra, 127 N.J. at 338, 605 A.2d 230 (citation omitted).]
If evidence of other-crimes is admitted, the trial judge must instruct the jury and "state specifically the purposes for which the evidence may be considered and, to the extent necessary for the jury's understanding, the issues on which such evidence is not to be considered." State v. Stevens, 115 N.J. 289, 309, 558 A.2d 833 (1989).
Defendant argues that the State failed to satisfy the first prong of the Cofield test because the evidence of defendant's prior possession of a gun was not probative with regard to any material issue in the case. At trial, the State argued that the evidence of prior gun possession was relevant to defendant's ability to *635 possess a firearm and relevant to whether he was armed on the day of the killings. When the State first elicited the testimony that Lakesha had seen defendant with a gun a few days prior to the killings, defendant objected. The trial judge overruled the objection. However, after Lakesha resumed testifying, she stated that she had seen defendant a few weeks prior to the killings. Defendant renewed his objection. The judge at first sustained defendant's objection because the prior possession had been two weeks before the killings. However, after recess, the judge spoke with Lakesha outside the jury's presence and learned that, on the night that Lakesha saw defendant with the gun, he had it in his possession for the entire evening while he played cards with friends. Thus, the judge reversed her ruling and permitted the evidence, finding that the evidence tended to make it more likely that defendant possessed a gun on the night of the killings. Thus, the judge allowed the testimony; however, she gave the jury a limiting instruction. She informed the jury to consider defendant's possession of the gun two weeks prior to the killings as relevant only to whether defendant had access to a gun.
The next day Latisha testified and corroborated Lakesha's testimony that defendant had, on a prior occasion, possessed a gun. Defendant again objected on the grounds that such evidence was other-crimes evidence. The trial judge held that under the Cofield test, the testimony was permissible. During jury instructions, the judge informed the jury that the evidence of prior possession elicited from both Lakesha and Latisha could only be considered for the limited purpose of establishing defendant's access to a gun. The State admits that possessing a gun is not a crime or wrong under Rule 404(b). Yet the evidence satisfies the Cofield test, particularly in light of the specific limiting instruction given to the jury. Lastly, the State notes that even if the judge erred in permitting the testimony, the error was harmless because of the overwhelming evidence of guilt, the negligible weight of such evidence, the limiting instructions, and the likelihood that the jury failed to accept the witnesses' testimony as credible. We agree. Even if the judge improperly admitted the evidence, the error was harmless. The strength of the circumstantial evidence indicating that defendant possessed a gun at Nate's apartment and shot the two victims with the gun overcame any prejudice that might have resulted from testimony that defendant possessed a gun on a prior occasion.

VI.
Defendant's trial counsel, an attorney designated by the Public Defender's Office, was "a close personal friend" of Sergeant Joseph Forte, the chief investigator for the case and a witness for the State at trial. Sergeant Forte had been involved in defendant's arrest and the subsequent questioning. Defendant notified counsel that he was concerned with counsel's ability to adequately cross-examine Sergeant Forte, and also notified the Public Defender's Office requesting new counsel. The Public Defender's Office refused to grant defendant's request. Counsel then notified the court of defendant's concerns. Counsel, however, also indicated to the court that he believed there was no conflict of interest between himself and defendant, or a divided loyalty between his friendship with Sergeant Forte and his representation of defendant. Counsel requested an adjournment, which was denied. The court discovered that defendant knew of counsel's friendship with Sergeant Forte for more than a year prior to the hearing date, yet did not voice his concern until shortly before trial.
Defendant contends that counsel's conflict of interest, or the appearance of impropriety, rendered the trial fundamentally unfair. We disagree.
The Rules of Professional Conduct in New Jersey provide:

*636 A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interest, unless:
(1) the lawyer reasonably believes the representation will not be adversely affected; and
(2) the client consents....

[R.P.C. 1.7(b).]
Legal counsel in criminal matters must have undivided loyalty to their clients and have representation that is "untrammeled and unimpaired" by conflicting interests. State v. Bellucci, 81 N.J. 531, 538, 410 A.2d 666 (1980) (citations omitted). The test is whether or not a conflict exists which prevents counsel from serving as a "vigorous partisan" of the client's interest. Id. at 541, 410 A.2d 666. As noted, defendant's assigned counsel did not believe that his friendship with the investigating officer would interfere with his responsibility as a "vigorous partisan." See ibid.
On appeal, defendant relies upon State v. Needham in which the court granted the State's motion to disqualify defense counsel because defense counsel had previously provided legal representation for the State's chief witness. 298 N.J.Super. 100, 688 A.2d 1135 (Law Div.1996). In Needham, the court reasoned that defense counsel would be unable to vigorously cross-examine the State's witness, his former client. Id. at 105-06, 688 A.2d 1135. Defendant here argues that a similar situation was present, but that the conflict is with a personal friend, rather than with a former client. Additionally, here, it was only the defendant's perception that his counsel's representation was undermined by the friendship between counsel and the State's witness.
Defendant does not allege that counsel had previously represented Sergeant Forte, or that they were in business together. According to the Rules of Professional Conduct, an attorney cannot represent a client if the attorney is limited by his or her responsibilities to a third person or limited by the attorney's own interests. R.P.C. 1.7. However, friendship alone, without more, should not preclude effective representation. Trial counsel's close friendship with Sergeant Forte was not alleged to be so strong as to outweigh counsel's obligation to vigorously represent defendant. We thus conclude that the trial judge did not abuse her discretion in permitting defendant's counsel to represent defendant at trial.

VII.
Defendant contends that the trial judge failed to give sufficient weight to the mitigating circumstance that this criminal episode was defendant's first indictable conviction. We disagree.
At sentencing, the judge determined that three aggravating factors applied: the nature and circumstances of the offense; the risk that defendant would commit another offense; and the need to deter him and others from violating the law. See N.J.S.A. 2C:44-1(a)(1), (3), (9). The judge found one mitigating factor, defendant's lack of a prior criminal record, to which she gave minimal weight. She weighed the aggravating factors regarding the nature of the offense and the need to deter heavily, but weighed the risk that a defendant would commit another offense moderately. Clearly, the judge did not perform a quantitative analysis of the aggravating and mitigating circumstances, but properly performed a qualitative analysis and fully explained when certain factors were deemed more or less important than other sentencing considerations.
When reviewing a sentence imposed after conviction, a reviewing court must determine whether the sentencing judge properly applied the standards and guidelines for sentencing. The reviewing court may not, however, substitute its judgment for that of the sentencing court's, and must affirm a sentence as long *637 as the sentencing court properly identified and balanced the relevant aggravating and mitigating factors. State v. Megargel, 143 N.J. 484, 493-94, 673 A.2d 259 (1996); State v. O'Donnell, 117 N.J. 210, 215, 564 A.2d 1202 (1989). The reviewing court may modify the sentence if it shocks the judicial conscience. State v. Morton, 155 N.J. 383, 465, 715 A.2d 228 (1998); State v. Roth, 95 N.J. 334, 365, 471 A.2d 370 (1984).
Here, the sentencing judge gave minimal weight to the mitigating factor of defendant's lack of a criminal record. She reasoned that, because defendant was only nineteen when he killed K.C. and Malik, he had been an adult for so short a time that his lack of a criminal record warranted only minimal weight.
Defendant argues that the judge should have given the mitigating factor greater weight. In addition, the mitigating factor should have counterbalanced the aggravating factor that defendant would likely commit other offenses. However, the trial judge satisfied her duty to identify and balance the aggravating and mitigating factors. Even if she had given greater weight to the mitigating factor, the three aggravating factors are sufficient to outweigh the single mitigating factor, particularly because, as the judge determined, the nature of the murder of K.C. was exceptionally heinous. Having considered the record and the arguments of counsel, we conclude that the findings of fact regarding aggravating and mitigating factors were based on competent and credible evidence in the record, that the court did not apply incorrectly the sentencing guidelines enunciated in the Code and that, in applying the facts to the law, the court reached a conclusion that could have reasonably been made upon a weighing of the relevant factors. See State v. O'Donnell, supra, 117 N.J. at 215, 564 A.2d 1202 (1989); State v. Ghertler, 114 N.J. 383, 390, 555 A.2d 553 (1989); Roth, supra, 95 N.J. at 365, 471 A.2d 370. Nor does the sentence shock the judicial conscience. See Morton, supra, 155 N.J. at 465, 715 A.2d 228; Roth, 95 N.J. at 365, 471 A.2d 370.

VIII.
In addition to defendant's general attack upon his aggregate sentence, discussed in Part VII, supra, of this opinion, defendant contends that the imposition of a consecutive sentence with a period of parole ineligibility on count five of the indictment was improper. We agree.
Defendant was convicted of possessing a handgun without a permit, for which he was sentenced to a consecutive term of five years with a two-and-a-half-year period of parole ineligibility. Defendant argues that "no adequate legal basis existed for the imposition of a consecutive sentence" for the weapons charge.
Courts must consider the following factors when deciding whether to impose a consecutive sentence:
(a) the crimes and their objectives were predominantly independent of each other;
(b) the crimes involved separate acts of violence or threats of violence;
(c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;
(d) any of the crimes involved multiple victims; [and]
(e) the convictions for which sentences are to be imposed are numerous.
[State v. Yarbough, 100 N.J. 627, 644, 498 A.2d 1239 (1985), cert. denied, 475 U.S. 1014, 106 S.Ct. 1193, 89 L.Ed.2d 308 (1986).]
Consecutive sentences are not an abuse of discretion when separate crimes involve separate victims, separate acts of violence, or occur at separate times. State v. Roach, 146 N.J. 208, 230, 680 A.2d 634, cert. denied, 519 U.S. 1021, 117 S.Ct. 540, 136 L.Ed.2d 424 (1996) (citations omitted).
*638 Here, the judge reasoned that the "objectives and purposes" of the crimes for weapons possession and murder are different, and the victims as well were different. Whereas the victim of the murder and manslaughter charges were K.C. and Malik, the true victim of unlawful possession of a handgun is society as a whole. The judge determined that only two of the five Yarbough factors applied, yet imposed a consecutive sentence. The objective and purpose of the unlawful possession statute is to regulate and monitor those who possess weapons, presumably to prevent irresponsible owners from possessing weapons. The ultimate goal is to protect others from being killed by those who own weapons. "There is a strong legislative policy in this State with respect to gun control, designed to protect the public, which places restrictions on those who may carry such weapons and is intended to prevent criminal and other unfit elements from acquiring and possessing them." State v. Wright, 155 N.J.Super. 549, 553, 383 A.2d 122 (App.Div.1978) (citations omitted). The purpose of the murder statute is obviously to protect the public and individuals from unlawful killing. Thus, the objective of each is similar. Furthermore, the victims sought to be protected by the two statutes are the same. Both K.C. and Malik were part of the group of victims in society whom the possessions statute sought to protect.
The judge's rationale for imposing consecutive sentences is unsupported under the Yarbough analysis because only two factors applied, and in view of the life term with thirty years of parole ineligibility, the consecutive sentences must be deemed unreasonable. The conviction for unlawful possession must be served concurrently to the conviction for murder. See State v. Mendez, 252 N.J.Super. 155, 169-70, 599 A.2d 565 (App.Div.1991), certif. denied, 127 N.J. 560, 606 A.2d 371 (1992) (remanding a sentence of life for murder followed by a consecutive five-year term for unlawful possession because the trial court failed to explicitly consider the Yarbough sentencing criteria).
With the exception of defendant's sentence imposed under count five of the indictment, defendant's conviction and the sentences imposed are affirmed. Defendant's sentence on count five is reversed and the matter is remanded to the trial court for the reimposition of sentence consistent with this opinion.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] The ski mask in question was not described by defendant in his statement to police. The mask taken from Hall was described as a foam half-mask, which may be considered a ski mask.