NOT FOR PUBLICATION WITHOUT THE
 APPROVAL OF THE APPELLATE DIVISION
 This opinion shall not "constitute precedent or be binding upon any court."
 Although it is posted on the internet, this opinion is binding only on the
 parties in the case and its use in other cases is limited. R.1:36-3.

 SUPERIOR COURT OF NEW JERSEY
 APPELLATE DIVISION
 DOCKET NO. A-1205-14T1

STATE OF NEW JERSEY,

 Plaintiff-Respondent,

v.

LARRY CARDONA, a/k/a LARRY
CORDONA,

 Defendant-Appellant.
_______________________________

 Submitted January 23, 2017 – Decided May 11, 2017

 Before Judges Nugent and Haas.

 On appeal from Superior Court of New Jersey,
 Law Division, Union County, Indictment No.
 11-09-0940.

 Joseph E. Krakora, Public Defender, attorney
 for appellant (Theresa Y. Kyles, Assistant
 Deputy Public Defender, of counsel and on the
 brief).

 Grace H. Park, Acting Union County Prosecutor,
 attorney for respondent (Milton S. Leibowitz,
 Special Deputy Attorney General/Acting
 Assistant Prosecutor, of counsel and on the
 brief).

PER CURIAM
 Defendant Larry Cardona appeals from a judgment of conviction

for three second-degree crimes: two weapons offenses and

aggravated assault. For those crimes, a judge sentenced defendant

to an aggregate sixteen-year prison term with eleven and one-half

years of parole ineligibility. On appeal, defendant argues:

 POINT I

 THE WARRANTLESS SEARCH OF CARDONA'S BEDROOM,
 WHICH WAS NOT SHOWN TO HAVE BEEN BASED ON A
 VALID CONSENT TO SEARCH, VIOLATED MR.
 CARDONA'S RIGHTS AGAINST UNREASONABLE
 SEARCHES AND SEIZURES. THE INTERESTS OF
 JUSTICE REQUIRE THAT THIS COURT REVIEW THE
 RECORD ANEW AND ORDER THAT THE FRUITS OF THE
 UNCONSTITUTIONAL SEARCH SHOULD HAVE BEEN
 SUPPRESSED.

 POINT II

 THE COURT ERRED IN ADMITTING THE PRIOR
 STATEMENTS OF ROBIN NUNEZ AND PAULINO JUAREZ
 INTO EVIDENCE AS THE STATE FAILED TO SATISFY
 THE STANDARDS OF STATE V. GROSS. U.S. CONST.,
 AMENDS. VI, XIV; N.J. CONST., ART. 1, PAR. 10.

 POINT III

 THIS MATTER MUST BE REMANDED FOR RE-SENTENCING
 BECAUSE CONSECUTIVE SENTENCES ARE UNWARRANTED
 IN THIS MATTER, AND THE TERM OF YEARS IMPOSED
 FOR AGGRAVATED ASSAULT IS EXCESSIVE DUE TO THE
 IMPROPER FINDING OF AGGRAVATING FACTOR ONE.

For the reasons that follow, we affirm.

 In September 2011, a Union County grand jury charged defendant

in an indictment with first-degree attempted murder, N.J.S.A.

2C:5-1 and N.J.S.A. 2C:11-3 (count one); second-degree aggravated

 2 A-1205-14T1
assault, N.J.S.A. 2C:12-1(b)(1) (count two); second-degree

unlawful possession of a weapon, a handgun, N.J.S.A. 2C:39-5(b)

(count three); and second-degree possession of a weapon for an

unlawful purpose, N.J.S.A. 2C:39-4(a) (count four). Following the

indictment, the State and defendant filed pre-trial motions.

 Defendant moved to suppress a box of bullets, gang

memorabilia, and other evidence police seized when they searched

his bedroom, in his mother's home, with her written consent. The

court denied defendant's motion.

 The State moved to admit evidence of defendant's gang activity

and to allow an expert to testify about various aspects of gang

activity. After conducting motion hearings, the court determined

evidence of defendant's gang activity was admissible under

N.J.R.E. 404(b), but denied the State's application to present

expert testimony on the subject unless issues arose during trial

that needed explanation.1

 At the conclusion of defendant's trial, the jury acquitted

him of first-degree attempted murder, but convicted him of the

remaining counts. At sentencing, the court merged count four,

possession of a weapon for an unlawful purpose, with count two,

1 During the trial, the court permitted the State to present
expert testimony on gang activity to the jury. The court's
decisions on the State's motion concerning gang activity and the
expert have not been appealed.

 3 A-1205-14T1
aggravated assault; and sentenced defendant on count two to a ten-

year prison term subject to the No Early Release Act (NERA),

N.J.S.A. 2C:43-7.2. On count three, unlawful possession of a

weapon, the court imposed a consecutive six-year prison term with

thirty-six months of parole ineligibility. This appeal followed.

 We first recount the testimony the parties presented at the

hearing on defendant's suppression motion. Elizabeth Police

Department Detective Amilcar Colon testified that on April 23,

2011, police arrested defendant and charged him with the victim's

attempted murder. Although the victim had been shot, law

enforcement authorities had not recovered the gun. Aware that

defendant resided with his mother at her Elizabeth home, Detective

Colon and four or five other officers drove there that night and

met with her.

 The detective spoke Spanish somewhat fluently and had no

difficulty communicating in Spanish on a day-to-day basis. He

spoke in Spanish when communicating with defendant's mother.

According to Detective Colon, he had "not one bit" of difficulty

understanding defendant's mother throughout their entire

interaction. She appeared to be lucid and sober, and had no

difficulty understanding him.

 Defendant's mother answered Detective Colon's knock at her

door. He and the other officers entered an enclosed porch area

 4 A-1205-14T1
to explain the situation. Detective Colon testified that, at

first, the situation was "kind of confusing" for defendant's mother

"because she [did not] know what was going on," but after he

explained the events her son was involved in, their relationship

became more helpful and cordial.

 Detective Colon authenticated a Spanish consent-to-search

form that he and defendant's mother signed at 11:10 p.m. The

court admitted the form into evidence. The detective testified

that he discussed the form with defendant's mother before she

signed it. He handed the consent form to her and explained, in

Spanish, what the consent form was. He "explained to her that it

was a permission to search [and] that she had every right to

refuse, if she wanted to." He also afforded her the chance to

read the document, which she appeared to do. She expressed no

confusion; rather, she discussed how her son had been a problem

lately, "'hanging out, smoking, doing whatever.'"

 Detective Colon told defendant's mother the officers wanted

to search defendant's room. According to Detective Colon,

defendant's mother seemed fine and appeared to understand him when

he told her she had the right to refuse to consent. No one

threatened her or made any promises to her before she signed the

form.

 5 A-1205-14T1
 Defendant's mother and Detective Colon moved to the kitchen,

where she signed the form. Other officers were either in the

kitchen or on the first floor at the time. Detective Colon

testified explicitly that none of the officers went upstairs before

defendant's mother signed the form.

 After defendant's mother signed the consent-to-search form,

officers from the night squad went to the room and searched it.

The officers found and seized the following items: a box containing

fifty-seven .45 caliber Winchester bullets; a yellow and black

bandana; a yellow do-rag with a partial gang manifesto; three

envelopes addressed to defendant, sent by an individual who was

incarcerated; a legal notice from the Union County Probation

Department; a State of New Jersey Health Benefits identification

card; a health insurance card; and a Public Defender reimbursement

form.

 Defendant's mother, using an interpreter to testify on behalf

of her son, offered a different account of the events leading up

to the search of her son's room.2 According to her, during the

evening of April 23, 2011, she received a call from the Elizabeth

Police Department. The caller said the police needed to search

her house. She replied, "yes, of course. You may come."

2 Defendant's mother testified before Detective Colon. Defendant
consented to her testifying first.

 6 A-1205-14T1
 Approximately an hour later, Detective Colon and other law

enforcement officers arrived at the home and knocked on the front

door. Defendant's mother opened the door and Detective Colon and

the other officers stepped inside. They asked to search her son's

bedroom for a gun.

 According to defendant's mother, the police asked her to sign

a permit authorizing them to search the house. Officers were

already in her son's bedroom when she was first shown the form.

She testified she then led the officers to her son's bedroom, but

before they began their search, Detective Colon informed her of

her right to refuse.

 According to the consent form, defendant's mother authorized

law enforcement to conduct "a complete search of [her] entire

house[.]" However, she said she was "nervous" and did not "really

read [the form] well." She said police did not thoroughly explain

the form before she signed it. While defendant's mother

acknowledged in the form that she had the right to refuse the

search, she nevertheless consented without feeling forced to do

so.

 After considering the testimony of Detective Colon and

defendant's mother, the trial court denied defendant's suppression

motion. The court noted some inconsistencies between the two

witnesses' accounts and resolved them in favor of the detective's

 7 A-1205-14T1
testimony. The court found that Detective Colon explained the

consent form to defendant's mother. The court concluded

defendant's mother knowingly and voluntarily consented to the

search after being told she had the right to refuse.

 The case proceeded to trial. The State presented evidence

that on the night of April 11, 2011, the victim, a member of the

“Rollin 60s Crips” (60s) street gang, and a friend with no gang

affiliation, went to a gas station in Elizabeth to pick up a

“Dutch,” or "blunt." While at the gas station, they encountered

members of the rival Latin Kings (Kings) gang. The victim, then

twenty years old, had known the Kings gang members, including

defendant, since he was eleven or twelve.

 Shortly after the encounter with the Kings gang members, the

victim and his friend walked away from the gas station. At trial,

the victim claimed he and his friend walked in a different

direction from that taken by the Kings gang members. As the victim

and his friend walked away, someone shot the victim. The victim

testified the shot came from a passing car, and defendant was

nowhere around.

 At the hospital in the days following the shooting, the victim

gave police a statement inconsistent with that of his trial

testimony. According to his statement, the victim "had some beef"

with defendant, who was looking to fight the victim. As the victim

 8 A-1205-14T1
prepared to fight, defendant "walked in front of [him] . . . turned

around[,] and shot [him]." The victim was positive defendant was

the shooter and identified a photograph of defendant. Although

defendant fired the gun once, the victim instinctively tried to

block the shot with his hand. He was wounded in the hand and in

the groin. The victim then ran back to the gas station with his

friend while the others fled the scene.

 As previously noted, the victim refused to implicate

defendant at trial. The victim denied having any memory of his

sworn, audio-recorded statement to the police, claiming he was

heavily sedated in his hospital bed when he allegedly gave the

statement.

 Asserting the victim’s trial testimony was contrary to his

previous sworn statement, the prosecutor moved under N.J.R.E.

803(a)(1) and State v. Gross, 121 N.J. 1 (1990), to admit the

prior statement. The court conducted a hearing under N.J.R.E. 104

to determine the reliability of the statement. The victim and an

officer testified.

 The victim claimed he could not remember anything about the

statement, including signing it. Elizabeth Police Department

Detective Vincent Napoli, who obtained the statement from the

victim, testified he did not exhibit any difficulties in providing

the statement nor did he show any signs of drug or alcohol

 9 A-1205-14T1
influence. Detective Napoli noted the victim was not in custody

or under arrest when he gave the statement. In addition, the

night before the detective took the statement, the victim told the

detective who was responsible for the shooting. The detective

explained that despite giving the statement, the victim was "very

scared" and reluctant to provide details because of the involvement

of the Latin Kings.

 After considering the testimony, the court found the State

had established the statement’s reliability by a preponderance of

the credible evidence. Specifically, the court stated:

 [the statement] is a sound recording. The
 circumstances under which it was given . . .
 establishe[] not only that [the victim] was
 lucid and not under any undue coercion at the
 time, but . . . also . . . that what he [is]
 saying now, his lack of recollection is
 feigned. I'm satisfied that the circumstances
 under [which] it was given . . . evidence[]
 its reliability. I'm also satisfied that it's
 inconsistent with his testimony, and I will
 allow the State to confront the witness with
 this statement.

In front of the jury, the prosecutor impeached the victim with his

prior sworn statement.

 To bolster its case against defendant, the State called the

victim's friend to testify. However, as with the victim, the

friend denied recalling the particulars of the shooting. The

friend acknowledged he was “really uncomfortable” testifying at

 10 A-1205-14T1
trial as he continued to deny any recollection of the incident.

He also claimed he did not recall giving two statements to law

enforcement officers.

 The State moved to admit the friend's video-taped statement,

recorded April 19, 2011, under N.J.R.E. 803(a)(1).3 In that

statement, the friend told Detective Napoli that as he, the victim,

defendant, and another person walked away from the gas station

together, the victim told defendant, "I know y'all going to jump

me." Although defendant replied, "ain't nobody going to jump

you," defendant pointed and fired a gun at the victim.

 The court conducted another N.J.R.E. 104 hearing. The friend

claimed he feared arrest had he not told law enforcement what they

wanted to hear. In contrast, Detective Napoli testified he did

not tell the friend what to say in his statement and that the

friend did not appear to be under the influence of any substances.

Detective Napoli emphasized he did not threaten or coerce the

friend during their interview.

3 The friend also provided a video-taped statement to Detective
Napoli on April 12, 2011. In his April 12th statement, the friend
denied being present during the shooting and made no mention of
defendant. Detective Napoli returned for an additional interview
on April 19, 2011, because the April 12th statement was inconsistent
with the statement the victim had made to officers while
hospitalized. Defendant does not challenge the admissibility of
the friend's April 12th statement.

 11 A-1205-14T1
 The court admitted the statement, satisfied that it "was

given under circumstances evidencing its reliability." The court

based this finding in part on the fact that the statement was

video-recorded. In addition, the court explained:

 I am also satisfied that [the friend] is
 feigning a lack of recognition, and the jury
 is entitled to hear what he said at a prior
 time. He's, in effect, putting up a bridge,
 preventing the prosecutor from having him
 recount those previous events. . . . I make
 that finding of feigned lack of recollection
 based upon his demeanor for one. He's just
 monotonous. Unlike [the victim] who had the
 same feigned lack of recollection, but where
 [the victim] had that light smile in his
 background, like, yeah, I know we all know
 that I'm just faking, and he was almost cute
 about it.

 [The friend] is just monotonous. He
 denies knowing or remembering anything. It's
 clear to me he's not being truthful when he
 says that, and I think a jury is entitled to
 hear what he previously said and evaluate the
 reliability.

The State then played the friend's recorded statement to the jury.

 The State presented other evidence, including a shell casing

found at the scene and the items the police seized from defendant's

bedroom. A medical witness, qualified as an expert in trauma

surgery, testified that when the victim arrived at the hospital,

his blood pressure was very low and he exhibited signs of shock

from blood loss. The doctor testified the victim was “rapidly

approaching death” based on his condition. According to the

 12 A-1205-14T1
doctor, the victim was shot "in the right groin . . . where [the]

leg attaches to the rest of [the body]." As part of that wound,

the doctor noted the victim sustained an injury to his "common

femoral artery."

 Defendant did not testify. As previously noted, the jury

convicted defendant of two weapons offenses and aggravated

assault.

 In the first argument defendant raises on appeal, he

challenges the trial court's denial of his suppression motion.

Specifically, he argues "the State failed to show that [defendant's

mother] gave voluntary consent, aware of her right to refuse."

Defendant further argues that "[e]ven if she did otherwise

ultimately give a knowing consent, the search was unconstitutional

because it was under way before she was fully advised of her rights

and before she signed the consent-to-search form." Lastly,

defendant asserts his mother's "language barrier was . . . a

frustration for her," and "[i]t was fully evident at the hearing

that she was frightened and confused by the police officers who

telephoned her and then arrived, in force, at her home."

 Defendant's arguments are without sufficient merit to warrant

discussion in a written opinion. R. 2:11-3(e)(2). Her arguments

are based on the implicit proposition that the trial court should

have accepted her testimony as credible. To the extent Detective

 13 A-1205-14T1
Colon's testimony contradicted that of defendant's mother, the

court found the detective's testimony credible. Our standard of

review requires deference to trial court's findings of fact,

including its credibility determinations. See State v. Scriven,

226 N.J. 20, 32 (2016). That is particularly so as "to those

findings of the trial judge which are substantially influenced by

his opportunity to hear and see the witnesses and to have the

'feel' of the case, which a reviewing court cannot enjoy." State

v. Johnson, 42 N.J. 146, 161 (1964). Thus, if our review satisfies

us the trial court's findings could reasonably have been reached

on sufficient, credible evidence present in the record, our task

is complete and we should not disturb the result. Id. at 162.

Such is the case here.

 Defendant's second argument — the trial court erred by

admitting the prior statements the victim and his friend gave to

law enforcement officers — is equally unavailing. Defendant

contends "[t]he 'physical and mental condition' of [the victim],

the 'nature of [his] interrogation,' and his 'motive to fabricate'

weighed against finding his statement reliable and admitting it."

Defendant further contends the victim's friend "thought he would

be in trouble if his story did not conform to [the victim's]."

Thus, defendant believes the friend "had . . . obvious motives to

fabricate, first in order to avoid the threatened 'consequences,'

 14 A-1205-14T1
and secondly to assist his good friend by corroborating his account

of events."

 Once again, defendant's arguments overlook the trial court's

credibility determinations and our standard of review. The

arguments are, essentially, disagreements with the weight the

trial court gave to the testimony presented at the N.J.R.E. 104

hearings. Like his arguments concerning his mother's consent,

defendant's arguments concerning the admission of the victim's and

his friend's prior statements are largely based on the implicit

premise that the court should have found credible the victim's and

friend's claimed lack of memory and, in the friend's case, the

alleged coercion. Ample evidence in the record supported the

trial court's determination. Defendant's arguments to the

contrary are without sufficient merit to warrant further

discussion. R. 2:11-3(e)(2).

 In his final argument, defendant contends the trial court's

imposition of consecutive sentences was unwarranted and the

custodial term imposed on the aggravated assault offense is

excessive. We disagree.

 The role of an appellate court in reviewing a sentence is to

determine:

 (1) whether the exercise of discretion by the
 sentencing court was based upon findings of
 fact grounded in competent, reasonably

 15 A-1205-14T1
 credible evidence; (2) whether the sentencing
 court applied the correct legal principles in
 exercising its discretion; and (3) whether the
 application of the facts to the law was such
 a clear error of judgment that it shocks the
 conscience.

 [State v. Megargel, 143 N.J. 484, 493 (1996)
 (citation omitted).]

 When adhering to this standard of review, appellate courts

afford considerable deference to the decision of a sentencing

court provided that "the trial judge follows the Code and the

basic precepts that channel sentencing discretion." State v.

Case, 220 N.J. 49, 65 (2014).

 Defendant first challenges the trial court's imposition of

consecutive sentences. The decision to impose consecutive

sentences under N.J.S.A. 2C:44-5(a) "requires analysis of

specifically enumerated factors" set forth under State v.

Yarbough, 100 N.J. 627 (1985), cert. denied, 475 U.S. 1014, 106

S. Ct. 1193, 89 L.Ed. 2d 308 (1986). State v. Randolph, 210 N.J.

330, 352-53 (2012). "When a sentencing court properly evaluates

the Yarbough factors in light of the record, the court's decision

will not normally be disturbed on appeal." State v. Miller, 205

N.J. 109, 129 (2011). However, when a sentencing court fails to

explain its decision to impose consecutive sentences, a remand is

generally required for the judge to provide an explanation on the

record. Ibid.

 16 A-1205-14T1
 In challenging the consecutive nature of his sentence,

defendant relies on State v. Copling, 326 N.J. Super. 417 (App.

Div. 1999), certif. denied, 164 N.J. 189 (2000) for the proposition

that the court should not have identified society as a separate

victim of his unlawful possession of a handgun conviction. In

that case, the defendant challenged his consecutive sentences for

murder and unlawful possession of a weapon, receiving concurrent

sentences for his remaining offenses. Id. at 440-41. There, the

trial judge imposed consecutive sentences on these two offenses

because:

 the 'objectives and purposes' of the crimes
 for weapons possession and murder are
 different, and the victims as well were
 different. Whereas the victim of the murder
 and manslaughter charges were K.C. and Malik,
 the true victim of unlawful possession of a
 handgun is society as a whole.

 [Id. at 441.]

We rejected the trial judge's rationale that the "objectives and

purposes" and victims of these two offenses were different, and

reversed the defendant's consecutive sentences. Id. at 441-42.

Specifically, we found the goal of the unlawful possession statute

"is to protect others from being killed by those who own weapons,"

similar to the objectives of the murder statute, which protects

the public from unlawful killing. Id. at 441. Additionally, the

 17 A-1205-14T1
court noted "the victims sought to be protected by the two statutes

are the same." Id. at 441-42.

 In the case now before us, the court explained that

consecutive sentences were appropriate because "these were

separate offenses that were committed at separate times with

separate victims." Specifically, the court noted "no one handed

. . . [defendant] the gun at the exact time of the shooting. It's

clear, based upon his possession of ammunition, . . . that he had

the gun before. It's a containing offense . . . [that] was

complete[] at the time he was in the gas station[.]" Although the

court did state that society was a separate victim in this case,

unlike Copling, the trial court here gave other reasons for

imposing consecutive sentences. That defendant committed separate

offenses, and that there can be no free crimes in a system for

which the punishment shall fit the crime, are relevant Yarbough

factors that support the imposition of consecutive sentences.

Supra, 100 N.J. at 643-44.

 Defendant also argues the trial court improperly speculated

as to whether defendant continuously possessed the handgun prior

to and after the shooting. That is not so. There is competent,

credible evidence in the record to support the trial court's

finding that defendant unlawfully possessed the handgun prior to

the shooting. None of the State's witnesses testified defendant

 18 A-1205-14T1
was handed the gun at the time of the shooting, and a search of

defendant's room uncovered a box of bullets of the same caliber

as the shell casing found on the curb near the gas station.

 Lastly, defendant argues the court erred by finding

aggravating factor one, N.J.S.A. 2C:44-1(a)(1), the nature and

circumstances of the offense, including whether it was committed

in an especially heinous, cruel, or depraved manner. Defendant

contends his conduct does not amount to such ruthless or callous

behavior required to sustain a finding of this aggravating factor.

 "[T]he finding, weighing, and balancing of aggravating and

mitigating factors involves marshaling information to assess the

severity of sentence to be imposed for the crime that the defendant

committed." Randolph, 210 N.J. at 349. When the finding of such

factors are "supported by competent, credible evidence in the

record, and properly balanced, [appellate courts] must affirm the

sentence and not second-guess the sentencing court[.]" Case,

supra, 220 N.J. at 65 (citing State v. Natale, 184 N.J. 458, 365

(2005)).

 Under aggravating factor one, "the sentencing court reviews

the severity of the defendant's crime, the single most important

factor in the sentencing process, assessing the degree to which

defendant's conduct has threatened the safety of its direct victims

and the public." State v. Lawless, 214 N.J. 594, 609 (2013)

 19 A-1205-14T1
(citations omitted). In that analysis, "courts applying

aggravating factor one focus on the gravity of the defendant's

conduct, considering both its impact on its immediate victim and

the overall circumstances surrounding the criminal event." Id.

at 609-10.

 Here, the sentencing court found aggravating factor one

because there was "a certain heinous, cold demeanor . . . displayed

by the defendant, where [the victim] is walked off to potentially

be executed. There's a coldness of purpose in . . . his words."

Significantly, however, the court emphasized that it did not give

aggravating factor one "an undue amount of weight" or "an

unbearable amount of weight," because doing otherwise would double

count the factor given that the infliction of serious bodily injury

was an element of aggravated assault. In view of these statements,

together with the court's finding other aggravating factors — the

risk of reoffense, elements of organized criminal activity,

defendant's prior criminal record, and the need to deter — and the

absence of mitigating factors, we conclude the court's analysis

of aggravating factor one does not require resentencing.

 For the foregoing reasons, we affirm defendant's convictions

and sentence.

 Affirmed.

 20 A-1205-14T1