913 A.2d 157 (2007)
389 N.J. Super. 409
STATE of New Jersey, Plaintiff-Respondent/Cross-Appellant,
v.
Malvern L. LEWIS, Defendant-Appellant/Cross-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted December 12, 2006.
Decided January 11, 2007.
*158 Yvonne Smith Segars, Public Defender, attorney for appellant/cross-respondent *159 (Virginia M. Lincoln, Designated Counsel, of counsel and on the brief).
Stuart Rabner, Attorney General, attorney for respondent/cross-appellant (Robert E. Bonpietro, Deputy Attorney General, of counsel and on the brief).
Appellant/cross-respondent submitted a supplemental pro se brief.
Before Judges: COBURN, AXELRAD and R.B. COLEMAN.
The opinion of the court was delivered by
COBURN, P.J.A.D.
A jury found defendant Malvern Lewis guilty of numerous offenses, and, after the merger of some of those offenses, judgment was entered for fourth-degree aggravated assault on Madeline Rosado, for fourth-degree contempt of a domestic violence order issued to protect Rosado, and for the first-degree murder of Clarence Brown. The trial judge sentenced defendant to prison for the following terms: eighteen months with nine months of parole ineligibility for the aggravated assault; a consecutive eighteen months with nine months of parole ineligibility for the contempt; and a consecutive life with thirty years of parole ineligibility for the murder. Defendant appeals, and the State cross-appeals. Although we reverse the aggravated assault conviction (Count VI) and the related weapons convictions (Counts VIII and IX), we affirm the convictions for contempt and murder.
Before describing the relevant facts, some introductory remarks are appropriate. In his opening statement, defense counsel told the jury that Lewis would testify in support of his claim that he killed Brown in self-defense. Lewis had agreed to that strategy after a full exploration of the matter on the record. But when the State rested and Lewis was called as a witness, he suddenly changed his mind, saying in front of the jury that he would not testify.
Because the State's proofs were quite overwhelming and contained no evidence of self-defense, defense counsel had to alter his strategy in summation. He conceded to the jury early on that "[t]his is not a case about who did it. . . ." He described the confrontation between defendant and Brown as a "life-and-death struggle," while trying to imply, although there was no evidence of it, that Brown was armed, and while asserting in general terms that the State had not met its burden of proof. The judge had excluded self-defense and heat-of-passion manslaughter, but had agreed to charge on aggravated manslaughter and manslaughter as lesser included offenses of murder. Since defense counsel only discussed the murder charge, we infer that he was implicitly arguing for the jury to convict, if it had to, of one of the lesser included offenses, or to indulge in jury nullification and find defendant not guilty because he acted in self-defense. In short, as we shall discuss in greater detail later, once defendant decided not to testify, the only conceivable issue in this case as to the murder was his state of mind. Therefore, our statement of facts will be abbreviated accordingly to demonstrate mainly that this killing could not have been done recklessly and had to have been done purposely or knowingly.

I
Around 1995, defendant, then age thirty, and Rosado, then eighteen, began living together. Rosado had three daughters, and defendant was the youngest daughter's natural father. In 1999, the family moved into a house on North Overbrook Avenue in Trenton.
*160 By early 2000, the couple's relationship had deteriorated. According to Rosado, the following events occurred: in April of that year, defendant prevented her from going to work and forced her to have sexual intercourse with him at knifepoint; during arguments on the following days, Lewis punched and kicked her and pulled her hair; on April 16, he threatened to kill himself, and later that same day, he held a steak knife to her throat while threatening to kill her. As a result, on April 25, Rosado obtained a domestic violence final restraining order from the Family Court. The order barred defendant from possessing weapons, from contact with Rosado or the children, and from going to the family house after returning once to retrieve his belongings. Defendant received a copy of the order at the hearing, and collected his belongings a few days later. In the meantime, Rosado and Clarence Brown had begun a romantic relationship. After defendant collected his belongings from the house, Brown moved in.
On May 7, 2000, sometime after 1:20 a.m. but before 3:30 a.m., defendant broke into Rosado's house, and repeatedly stabbed and clubbed Brown until he died. The medical examiner testified that Brown's body, which was clad only in boxer shorts, was covered with blood. Without contradiction, he also testified to the following wounds, all inflicted before death: (1) six stab wounds to the chest, all but one closely grouped over the heart; three of them inflicted with considerable force, the knife blade going deep into the victim's body, with one cut penetrating the diaphragm and one penetrating the heart; (2) four stab wounds to the back, all near the heart; two of them inflicted with considerable force, one penetrating the victim's lung and the other his aorta; (3) five knife slashes on the victim's neck, cutting both the right and left jugular veins; (4) many superficial defensive knife wounds to the victim's extremities; and (5) three head lacerations caused by a blunt object, a metal car tool known as "The Club," which was broken in two by its use in the attack. Expert blood splatter testimony indicated that a number of the wounds occurred while Brown was lying on the floor and while he was trying to escape.
Between 4:00 a.m. and 4:25 a.m., on May 7, Rosado and her children returned home from a trip to Atlantic City in a car driven by her brother Miguel Rosado. When she put her key in the front door of her house, defendant, carrying a knife in his hand, slammed the door open, and Rosado saw that the walls were covered with blood. She jumped off the porch to run away, but defendant grabbed her and stabbed her in the arm and cut her shoulder. The children screamed, and defendant said he would let Rosado live for her children. He then ran toward Miguel. Rosado reached out to stop him and was cut on her hand by the knife. Defendant ran away; Rosado went into the house, discovered Brown's body, left, and went with Miguel to a hospital, where she received five stitches for her main wound. When the police arrived, Rosado told them what happened and gave them defendant's description.
At 2:00 p.m., May 7, defendant approached a Ewing police officer and told him that he believed he was "wanted for murder in Trenton." He refused to indicate how he knew that. At Trenton police headquarters, an officer asked defendant if he was willing to talk about what happened, and defendant said, "no one can help me now." The police took photographs of defendant's body, which showed that he had no cuts, bruises or scrapes.

II
Point I of defendant's brief argues that he was denied the effective assistance *161 of counsel. He claims that his attorney failed (1) to adequately investigate his background, which would have indicated the presence of mental disabilities bearing on his guilt and his ability to assist in his defense; (2) to appreciate that the circumstances of the crime suggested mental illness; (3) to appreciate that defendant's conduct at the trial indicated relevant mental problems; and (4) to properly conduct the defense in various respects. None of these points appear to have any merit, but ineffective assistance of counsel claims are best left to post-conviction review. State v. Preciose, 129 N.J. 451, 460, 609 A.2d 1280 (1992). Consequently, we will not comment further on these claims other than to note this statement in defendant's brief respecting one aspect of what he perceives as evidence of a deranged mental state:
First and foremost, the nature and circumstances of this killing should have been a sufficient red flag to trigger some kind of psychological evaluation. The evidence shows that the assailant did not simply stab the victim and flee. He attacked him so viciously that almost all of the blood drained out of his body. The blood spatter on the walls and the amount of blood in the carpet by the front door was enormous, so enormous that counsel should have questioned his client's mental state at the very beginning of the investigation.
[Emphasis added.]
Point II of defendant's brief argues that the trial judge erred when he refused to sever the contempt charge and when he allowed the final restraining order to be admitted into evidence. Although we agree that the judge erred in both respects, we are obligated to disregard the errors in relation to both the contempt and the murder convictions because neither was "of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2.
The trial judge believed that because the evidence of defendant's prior attacks on Rosado was admissible to prove defendant's state of mind when he attacked Rosado and when he killed Brown, the restraining order was admissible. But that ruling is inconsistent with the Supreme Court's decision in State v. Chenique-Puey, 145 N.J. 334, 678 A.2d 694 (1996), which involved a consolidated trial on charges of terroristic threats and contempt of a domestic violence restraining order involving the same victim. After noting that the prior bad acts were admissible for a limited purpose on the terroristic threats charge, the Court held as follows:
Evidence of the restraining order is inadmissible, however, to prove terroristic threats. Admission of the order could have prejudiced unduly defendant by bolstering the victim's testimony regarding defendant's prior bad acts. A jury could interpret the order as a judicial imprimatur on the victim's testimony. The order creates the inference that if a court found defendant guilty of domestic violence in a prior proceeding, that defendant is more likely guilty of the present terroristic-threat charges. In the present case, moreover, the restraining order is not merely cumulative evidence. But see State v. Steed, 140 N.H. 158[153], 665 A.2d 1072 (1995)(holding that evidence of domestic-violence restraining order was cumulative in case for criminal trespass). Accordingly, we hold that the trial court should have severed the charge on terroristic threats to kill from the trial of the contempt of the domestic violence restraining order.
[Id. at 343, 678 A.2d 694.]
*162 The Court added that "[i]n the future, trial courts should sever and try sequentially charges of contempt of a domestic-violence restraining order and of an underlying criminal offense when the charges arise from the same criminal episode." Ibid. After outlining in greater detail the procedures to be followed, id. at 343-44, 678 A.2d 694, the Court reversed and remanded the terroristic threat charge but affirmed the contempt charge.
We note the State's contention that State v. Keys, 331 N.J.Super. 480, 752 A.2d 368 (Law Div.1998), aff'd o.b. 331 N.J.Super. 429, 752 A.2d 340 (App.Div.), certif. denied, 165 N.J. 607, 762 A.2d 221 (2000), supports what occurred in this trial. But that is so only because Keys is inconsistent with Chenique-Puey. See also State v. Lozada, 357 N.J.Super. 468, 815 A.2d 1002 (App.Div.2003)(where we applied Chenique-Puey, reversing convictions arising from a consolidated trial for stalking and violation of a domestic violence restraining order). In Lozada, we reversed both convictions because the contempt conviction was based on the stalking conviction, which was tainted by admission of the restraining order. Id. at 473, 815 A.2d 1002.
When there are issues about whether a defendant committed the crime or about his state of mind, Chenique-Puey clearly provides that a domestic violence order is unduly prejudicial evidence in the trial of the underlying crime.
Defendant's state of mind was at issue as it related to the attack on Rosado, and therefore we are satisfied that the aggravated assault conviction and the related weapons convictions must be set aside. But we cannot say that the error impacted on the contempt conviction, which we will therefore let stand, since it was based not merely on the attack on Rosado, but on defendant's unquestioned possession of a weapon and his unquestioned entry into the house, all events occurring before Rosado arrived.
There is also no basis for reversing the murder conviction. Throughout the trial, from the beginning to the very end, defendant conceded that he killed Brown. See State v. Wright, 155 N.J.Super. 549, 552, 383 A.2d 122 (App.Div.1978)(indicating that an admission made in an opening statement "obviated the necessity for the State to have proven" the fact admitted). If there had been evidence suggesting that his state of mind was less than purposeful or knowing, a reversal would be in order since the jury might have legitimately found him guilty of aggravated manslaughter or, perhaps, manslaughter. But there is no such evidence, and the judge's charge on those lesser included offenses simply gave defendant a chance he did not deserve.
The following cases are instructive on when a defendant is not entitled to a charge on lesser included offenses of murder. In each case, the lesser included charges were held to be unnecessary.
In State v. Tucker, 137 N.J. 259, 293, 645 A.2d 111 (1994), the Court rejected as meritless the defendant's claim that the trial judge erred in failing to instruct the jury on aggravated or reckless manslaughter, describing the contentions and evidence as follows:
Defendant asserts that a rational basis in the evidence existed to support a jury finding that the victim was stabbed after she died from asphyxiation and that defendant's conduct in forcing the gag into the victim's mouth was reckless rather than purposeful.
The medical examiner testified at trial that the victim had sustained multiple throat slashings, a deep stab wound to the left side of the neck, and a superficial *163 stab wound in midchest. The victim's carotid artery was severed, the anterior jugular vein was cut and a deep jugular vein was cut. He testified that "the stab wounds of the neck and multiple throat slashings" resulted in "extreme blood loss," which constituted "a major contributing cause of [death]".
In State v. Harris, 141 N.J. 525, 550-51, 662 A.2d 333 (1995), the Court found there was no rational basis for charging aggravated manslaughter when defendant fired a single shot into the victim's back and neck at close range while the victim was lying on the ground; in State v. Biegenwald, 126 N.J. 1, 18, 594 A.2d 172 (1991), four shots fired to the head at close range were held to be murder; in State v. Hightower, 120 N.J. 378, 413, 577 A.2d 99 (1990), three shots, including one to the brain, were held to be murder; and in State v. Hammond, 338 N.J.Super. 330, 339, 768 A.2d 1069 (App.Div.), certif. denied, 169 N.J. 609, 782 A.2d 427 (2001), we held that a jury could only find intentional murder when the victim was shot at close range in the shoulder, neck, back, leg and chest.
In the instant case, the blows were all inflicted at close range, and were more vicious than the wounds inflicted in all of the above cited cases. Consequently, there was no issue with respect to this defendant's state of mind: he intended to kill.
As Chief Justice Weintraub observed in State v. Macon, 57 N.J. 325, 335, 273 A.2d 1 (1971), "whether an error is reason for reversal depends finally upon some degree of possibility that it led to an unjust verdict." But the "possibility must be real, one sufficient to raise a reasonable doubt as to whether the error led the jury to a result it otherwise might not have reached." Id. at 336, 273 A.2d 1. Applying that test, we conclude that the error was harmless with respect to the murder conviction because the improperly received evidence only went to the killer's state of mind, which was plain and undeniable. Therefore, the murder conviction is affirmed.
Point III of defendant's brief argues that the judge erred in admitting the prior bad acts committed by defendant against Rosado. But those acts were admitted solely for the limited purpose of demonstrating defendant's state of mind, and thus caused no more prejudice than the restraining order, which we determined was irrelevant with respect to the convictions we are affirming.
Point IV of defendant's brief argues that the jury selection process denied defendant, who is black, a fair trial because the prosecutor improperly exercised peremptory challenges against black jurors. In general, defendant asserts that "[a]lthough the prosecutor managed to explain away some of her challenged African-American males, she did not explain her decision to excuse one black male and one woman who was closely connected to the black community."
Defense counsel first objected when the prosecutor used her fifth peremptory challenge to excuse a second black juror, Renee Warren. But the prosecutor explained, in response to the judge's inquiry, that she had exercised the challenge because the juror's husband had served a ten-year prison sentence for rape, a sentence which the female black juror believed was excessive. And defendant concedes that "[o]ne can hardly dispute this explanation." Without further inquiry from the judge, the prosecutor then offered to explain why she had excused the first black male juror, Alvon Randolph. But the judge ruled that an explanation *164 was not required, and defendant did not object.
The only other black male excused by the prosecutor was Michael Glanton. When defense counsel asked for an explanation, the prosecutor, based on the record developed during Glanton's voir dire, replied as follows:
[T]he explanation [is that] I prosecuted Glantons before. He has relatives in Trenton that are Glantons. In fact he has brothers that he sees once a week that he did not know were locked up is a concern to me particularly since I handled in the last five years a bunch of different Glanton files and he is the fore-person of the jury. He did not disclose the fact his cousin was the victim of [a] crime, and I have grave concerns whether or not later on during the pendency of this trial he might remember something with regard to a brother or whatever may [be] related back to me or my office and, frankly, I can't take that chance.
Although the judge did not excuse Glanton for cause, which was the prosecutor's first request, he noted that he found "it difficult to believe" that Glanton forgot about his murdered cousin and did not accept "his explanation as truthful about being out of the family seventeen years [and] not knowing about [the] incarceration of numerous members of his family." Ultimately, the judge concluded that he could not "fault the prosecutor for excusing" Glanton. And, indeed, defendant concedes that the prosecutor "did find a situation-specific reason to conclude [Glanton] might be biased against the State. . . ."
In all, the prosecutor used twelve peremptory challenges; three, as noted, excluded blacks, but two black women remained on the jury.
Of course, a prosecutor may not exercise peremptory challenges to remove potential jurors based on their race. State v. Gilmore, 103 N.J. 508, 524-26, 511 A.2d 1150 (1986). But the prosecutor is entitled to excuse such jurors on the grounds of situation-specific bias. Id. at 517, 511 A.2d 1150. And there is a rebuttable presumption that the prosecutor's exercise of peremptory challenges is constitutional. Id. at 535, 511 A.2d 1150. To rebut the presumption, a defendant must show that potential jurors wholly or disproportionately excluded were members of the cognizable group. Id. at 535-36, 511 A.2d 1150. In addition, a defendant must show a substantial probability that the challenges were based on assumptions about group bias rather than situation-specific bias. Id. at 536, 511 A.2d 1150. When the presumption has been rebutted, the prosecutor must articulate "clear and reasonably specific" explanations of "legitimate reasons" for exercising each of the peremptory challenges. Id. at 537, 511 A.2d 1150.
Given the circumstances described above, we are satisfied that defendant neither rebutted the presumption nor showed that the prosecutor's challenges were based on illegitimate grounds. Compare, e.g., State v. McDougald, 120 N.J. 523, 554-57, 577 A.2d 419 (1990)(prima facie showing made when prosecutor used ten of twelve peremptory challenges to excuse black jurors); State v. Watkins, 114 N.J. 259, 268, 553 A.2d 1344 (1989)(prima facie showing made when prosecutor peremptorily challenged every black juror except one, who was excused for cause) with State v. Bey, 129 N.J. 557, 585, 610 A.2d 814 (1992)(no prima facie showing made when prosecutor exercised one peremptory challenge against a black juror and another four against jurors who were not black); State v. Huff, 292 N.J.Super. 185, 192-93, 678 A.2d 731 (App.Div.), certif. denied, 146 N.J. 570, 683 A.2d 1165 (1996)(no prima *165 facie showing made when prosecutor excused the only remaining black juror where the prosecutor had previously used seven peremptory challenges to excuse white jurors).
Point V of defendant's brief argues that the blood spatter testimony came from an unqualified expert witness and that the photographs and video were unduly prejudicial. In the context of this case, these contentions are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). However, we note that this expert was far more qualified than the blood spatter expert found to be qualified in State v. Moore, 122 N.J. 420, 458-59, 585 A.2d 864 (1991); and unlike the situation in State v. Johnson, 120 N.J. 263, 296-99, 576 A.2d 834 (1990), where the blood spatter evidence was found to be unduly prejudicial because it was largely corroborative of other unchallenged testimony indicating the manner of death, here the evidence provided substantial support for the State's claim that defendant had not acted in self-defense. More specifically, the evidence showed that Brown was attacked while lying down, that he was further attacked while trying to escape, and that he was dragged from the hall back into the living room. We note that neither the photographs nor the video have been included in this record, thereby preventing our review of defendant's claim that some or all of them are unduly gruesome.
Apart from three points raised by defendant in a supplemental pro se brief,[1] which we find without sufficient merit to warrant discussion in a written opinion, R. 2:11-3(e)(2), defendant's final point is that the judge erred when imposing his sentence. More specifically, he says the judge should not have imposed a life term, and that under State v. Yarbough, 100 N.J. 627, 644, 498 A.2d 1239 (1985), cert. denied, 475 U.S. 1014, 106 S.Ct. 1193, 89 L.Ed.2d 308 (1986), *166 he should not have imposed consecutive sentences on the fourth-degree contempt and aggravated assault convictions. Those arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2).
The State's cross-appeal is limited to the argument that the judge erred in merging the fourth-degree aggravated assault on Rosado into the third-degree weapons possession offense as against Rosado. Defendant agrees that the merger was inappropriate, but since we are reversing both of those convictions, and the related but merged convictions, the point is moot.
Affirmed in part; reversed in part; remanded for further proceedings not inconsistent with this opinion.
NOTES
[1] 

POINT I THE FAILURE TO COMPLY WITH REQUIREMENTS OF R. 3:2-3 and R. 3:3-1(a)(b) RENDERS THE COMPLAINT-WARRANT CDR-2, D3 IN EVIDENCE NULL AND VOID. THE COURT LACKED SUBJECT MATTER JURISDICTION, AND PERSONAL JURISDICTION TO COMPEL THE DEFENDANTS PARTICIPATION IN ANY AND ALL PROCEEDINGS IN VIOLATION OF ARTICLE 1, PARAGRAPH 7 N.J. CONST., AMENDMENT 4 U.S. CONSTITUTION, AMENDT. 5 U.S. CONST., AMENDMENT 14 U.S. CONST., REQUIRING A REVERSAL OF THE JUDGMENT OF CONVECTION [SIC], THE COMPLAINTS AGAINST DEFENDANT DISMISSED, THE WARRANTS QUASHED, THE SENTENCES VACATED AND THE DEFENDANT RELEASED TO GO WITHOUT DAY [SIC].
POINT 2 THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN REFUSING TO CHARGE THE JURY FOR SELF-DEFENCE [SIC], PASSION PROVOCATION MANSLAUGHTER, PRIOR INCONSISTENT STATEMENTS, REDEFINING THE ELEMENTS OF KNOWINGLY, PURPOSELY, RECKLESSLY IN COUNTS 2 TO 9, AND COMBINING COUNTS 2, 4, 8 IN THE JURY CHARGE RESULTED IN THE DEFENDANT NOT RECEIVING A FAIR TRIAL AND WERE ERRORS REQUIRING A REVERSAL OF THE DEFENDANT'S CONVICTIONS AND SENTENCES.
POINT 3 THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY DENYING THE DEFENDANT HIS SIXTH AMENDMENT U.S.C.A. RIGHT TO CONFRONT, CROSS-EXAMINE AND EVALUATE COMPETENCY OF THE STATE'S PRIMARY WITNESS MS. MADELINE ROSADO, ON HER MENTAL HISTORY AND COMPETENCY TO TESTIFY, WHICH HAS UNQUESTIONABLE RELEVANCE TO HER CREDIBILITY AND HER ABILITY TO PERCEIVE, RECALL AND RESPOND TO EVENTS, FURTHERMORE, THE DEFENDANT WAS DENIED HIS SIXTH AMENDMENT U.S.C.A. RIGHT TO DISCOVERY OF MS. ROSADO'S MEDICAL-MENTAL RECORDS, AND DENIED HIS FOURTEENTH AMENDMENT U.S.C.A. RIGHT TO DUE PROCESS OF LIFE AND LIBERTY REQUIRING REVERSAL OF THE JUDGMENT OF CONVICTION AND SENTENCE.