**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5494-14T1

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

DEMARCUS DREW,

    Defendant-Appellant.

_____

Submitted September 19, 2017 — Decided August 8, 2018

Before Judges Yannotti and Leone.

On appeal from Superior Court of New Jersey, Law Division, Camden County, Indictment Nos. 12-09-2526 and 11-06-1382.

Joseph E. Krakora, Public Defender, attorney for appellant (Margaret McLane, Assistant Deputy Public Defender, of counsel and on the briefs).

Christopher S. Porrino, Attorney General, attorney for respondent (Arielle E. Katz, Deputy Attorney General, of counsel and on the brief).

PER CURIAM

    Defendant Demarcus Drew challenges his July 9, 2015 judgment of conviction in Indictment No. 12-09-2526. We affirm.

Defendant and Lisa Drew were dating for about six years, but titled themselves as husband and wife.[1] Lisa's son Dennis Harris lived with them in a second-floor apartment in Camden.

Harris testified as follows. Lisa let it be known to defendant that she was having a relationship with Marvin Simpson, known as Saleem. Defendant was jealous and angry, and did not want that relationship to continue. Defendant and Simpson had a violent relationship. They had a fight in which defendant "wouldn't stop punching" Simpson.

Harris testified that a "couple days" after the fight, in the pre-dawn hours of November 4, 2011, Harris awoke to hear Lisa screaming his name. Harris looked out the window. Harris could see defendant "perfectly" because defendant was standing right underneath a lamppost. Harris saw defendant standing with his arm out holding a gun, heard six shots fired, saw flashes from the gun, and saw a man fall to the ground. Harris went outside and saw defendant running across a field carrying a revolver. Lisa was huddled over the fallen man, yelling out "Saleem."

At around 4:45 a.m., the police arrived and found Simpson being held by Lisa, who was hollering. Simpson was taken to the

---

[1] We refer to her as "Lisa" to avoid confusion.

hospital. Detective Virginia Fallon processed the crime scene. She found no shell casings, and testified a revolver does not eject shell casings. No gun was ever recovered.

Harris was taken to the prosecutor's office, where he identified a photograph of defendant as the man he had seen with the gun. Harris initially denied he had seen the shooting. He later testified he did so because defendant "was still on the loose" and he was scared for Lisa and himself.

Wesley Ruiz testified as follows. He was with Simpson during the pre-dawn hours of November 4, smoking marijuana and drinking. While they went for a walk, Simpson had Ruiz knock at defendant's house, and yell upstairs for Simpson's female friend who lived there. Ruiz saw a man come to the window and say "don't come back here." The man was "dark skinned, skinny" with a "short haircut."

Ruiz testified that Simpson went to the house and yelled upstairs for his female friend. The man came to the window again and slammed it shut. The man then came running out of the house with a gun, got really close to Simpson, and started shooting. Ruiz ran. He heard three or four shots, perhaps more.

Later that day, detectives showed Ruiz a photo array, and a video of the procedure was shown to the jury. Ruiz testified that he was unable to make a positive identification, but indicated one photo "looked close" and "look[ed] something like him with an

Afro, but he didn't have no Afro." The photo showed defendant with an Afro. Ruiz was unable to identify defendant at trial.

Simpson died from his five gunshot wounds. Defendant was indicted for murder and other offenses. On December 7, 2011, deputy U.S. Marshals in Chicago arrested defendant, who was accompanied by Lisa.

Benjamin Alford testified defendant was housed with him at the county jail, and they discussed defendant's case. Alford testified that defendant said: he had a confrontation with a man, and told him to stay away from his house; the man showed up at his house one night; he chased and shot the man with a .22 revolver; and he left for Chicago that day with the gun. Alford testified against defendant under a cooperation agreement which gave him five years in prison for robbery.

The jury acquitted defendant of murder, but convicted him of second-degree manslaughter committed in the heat of passion resulting from reasonable provocation, N.J.S.A. 2C:11-4(b)(2); second-degree possession of a firearm for an unlawful purpose, N.J.S.A. 2C:39-4; and second-degree unlawful possession of a handgun, N.J.S.A. 2C:39-5. The trial court sentenced him to a total of twenty years in prison for those convictions.

Defendant appeals, arguing:

POINT I - THE COURT FAILED TO CONDUCT THE THIRD STEP OF THE GILMORE ANALYSIS, REQUIRING REVERSAL OF DEFENDANT'S CONVICTIONS.

POINT II — THE COURT ERRONEOUSLY ADMITTED A WITNESS'S NON-IDENTIFICATION, AND THE PROSECUTOR IMPROPERLY ARGUED TO THE JURY THAT THIS INADMISSIBLE NON-IDENTIFICATION ACTUALLY PROVED THAT THE DEFENDANT WAS THE SHOOTER. THESE ERRORS REQUIRE REVERSAL OF DEFENDANT'S CONVICTIONS. (Partially Raised Below).

POINT III — THE DEFENDANT WAS DENIED A FAIR TRIAL DUE TO THE ABSENCE OF JURY INSTRUCTIONS ON HOW TO EVALUATE THE TESTIMONY OF A COOPERATING WITNESS. (Not Raised Below).

POINT IV — DEFENDANT WAS PREJUDICED BY THE TRIAL COURT'S FAILURE TO CHARGE THE JURY REGARDING THE PROPER ASSESSMENT OF STATEMENTS ALLEGEDLY MADE BY HIM. (Not Raised Below).

POINT V — THE COURT FAILED TO PROPERLY APPLY THE YARBOUGH FACTORS SUCH THAT DEFENDANT'S SENTENCE IS MANIFESTLY EXCESSIVE.

II.

Defendant's first challenge concerns the prosecutor's exercise of peremptory challenges during jury selection. "[T]he opponent of the strike bears the burden of persuasion regarding racial motivation, and a trial court finding regarding the credibility of an attorney's explanation of the ground for a peremptory challenge is entitled to great deference." State v. Thompson, 224 N.J. 324, 344 (2016) (quoting Davis v. Ayala, __ U.S. __, __, 135 S. Ct. 2187, 2199 (2015)). "[A] trial court's ruling on the issue of discriminatory intent must be sustained

unless it is clearly erroneous." Ibid. (quoting Snyder v. Louisiana, 552 U.S. 472, 477 (2008)). We must hew to our standard of review.

During voir dire, an African-American potential juror, No. 197, testified he had a brother who had been arrested for multiple charges. The prosecutor exercised a peremptory challenge. After the next juror was questioned, there was a sidebar. Defense counsel noted Juror No. 197 was African-American and "just ask[ed] for the purposes of the record if there was any other reason" for excusing him.[2] The prosecutor responded:

> [A]s he sat down, right before we got started, he looked over at me with a weird smile, and he made a motion with his finger across — across his neck back and forth as if to make the symbol of like cutting somebody's head off or sawing someone's head off. . . . It made me feel very uncomfortable that he was sort of making motions to me and . . . I struck him.

The trial court asked defense counsel if he saw any gestures, and counsel replied: "I'm not challenging whether he saw it, but I didn't."

Meanwhile, that next potential juror, No. 375, a Hispanic-American female, had been asked: "If the State merely produces

---

[2] The transcript attributes all the statements by attorneys during this sidebar to "Unidentified," but context supports the attributions given in text here.

testimonial evidence, which is the testimony of individuals, and doesn't have things like fingerprints, and you were satisfied beyond a reasonable doubt, could you return a verdict in favor of — of the State?" She answered "Possibly," "I guess no," and then "No." When asked again, she replied "No," saying "[i]t would have to be more than testimony — [it] would have to be scientific, things of that nature." When asked a third time, she said "No," and then: "Without physical evidence? I don't know, . . . I would probably have to hear the testimony." The trial court then asked: "Could you follow my instructions as to the law in the case and apply that law to the facts that you find?" She said "Yes."

At the same sidebar, the prosecutor challenged Juror No. 375 because "[s]he specifically said she couldn't convict someone without physical evidence." The trial court said it was not going to excuse Juror No. 375 for cause because she said she could listen to the testimony and follow the court's instructions. The prosecutor responded that her statement was "enough of a reason . . . to use one of my peremptories." The court stated "Okay." The prosecutor excused her with his next peremptory challenge.

An African-American potential juror, No. 893, said he had a problem reading, saying "I need help with it" and "I understand verbal. It's just reading." He also said that he had family members "doing time right now," and that some of them were not

"dealt with fairly by the court system and the prosecutor."  Asked to explain, he said: "Like my uncle.  My uncle, he's locked up right now.  They gave him . . . a long charge to make because they gave him a burglary charge" though "he wasn't really on the premises. . . .  I think it was a setup type thing."

The trial court invited "followup questions" regarding Juror No. 893, and the prosecutor asked the juror whether his feeling that his uncle "was charged unfairly with this burglary [would] affect your ability to judge the police" witnesses or the "witnesses from the Prosecutor's Office," and the juror indicated it would not.  The prosecutor also asked the juror whether he would "be able to read for yourself" the written jury instructions and understand them.  The court interrupted and said it "would verbally give those instructions," and the juror responded he could "handle that."[3]

The prosecutor excused Juror No. 893 with his next peremptory challenge, and defense counsel objected.  At sidebar, the prosecutor explained: "Judge, there's two reasons for [excusing] him.  His reading problem is number one."  The prosecutor noted that he "misinterpreted the first question about a police officer"

---

[3] The transcript attributes the questions to "Unidentified," but context supports their attributions to the prosecutor.

on the jury questionnaire,[4] and seemed not to comprehend a lot of those written questions.  The prosecutor stressed: "the jury instructions . . . are given to jurors in writing, and if he can't read the simple questions on the jury questionnaire form, and if he can't read the simple questions on the jury questionnaire form, how is he going to read the complicated legal instructions[?]"  The prosecutor added: "Number two, he said his uncle was unfairly charged with burglary by the police."  The trial court said: "All right."  The jury was seated without further peremptory challenges by the prosecutor or further comment by defense counsel.

The United States and New Jersey Constitutions prohibit prosecutors from exercising peremptory challenges against potential jurors on account of their race or ethnicity.  Thompson, 224 N.J. at 339-440 (citing Batson v. Kentucky, 476 U.S. 79, 89 (1986), and State v. Gilmore, 103 N.J. 508, 524-29 (1986)).  In Gilmore, our Supreme Court adopted its analysis from People v. Wheeler, 583 P.2d 748 (1978).  Gilmore, 103 N.J. at 530-39.  As modified in State v. Osorio, 199 N.J. 486 (2009), that analysis provides for three steps.  First:

> step one requires that, as a threshold matter,
> the party contesting the exercise of a

_____

[4] That question asked "whether you'd give greater or lesser weight to the testimony of a police officer merely because of his or her status as a police officer."  The juror answered "Yes."  When asked to explain, he said: "by that I actually meant to say no."

peremptory challenge must make a prima facie showing that the peremptory challenge was exercised on the basis of race or ethnicity. That burden is slight, as the challenger need only tender sufficient proofs to raise an inference of discrimination.

Second, if the challenger meets that burden,

> step two is triggered, and the burden then shifts to the party exercising the peremptory challenge to prove a race- or ethnicity-neutral basis supporting the peremptory challenge. In gauging whether the party exercising the peremptory challenge has acted constitutionally, the trial court must ascertain whether that party has presented a reasoned, neutral basis for the challenge or if the explanations tendered are pretext.

Third, if the trial court believes a reasoned, neutral basis

has been tendered

> the third step is triggered, requiring that the trial court weigh the proofs adduced in step one against those presented in step two and determine whether, by a preponderance of the evidence, the party contesting the exercise of a peremptory challenge has proven that the contested peremptory challenge was exercised on unconstitutionally impermissible grounds of presumed group bias.

> [Id. at 492-93.]

Here, the prosecutor immediately offered to state his reasons, so the trial court did not have to rule on step one.[5] In

---

[5] "[T]he better practice is to allow the State to make a record of its reasons for exercising its peremptory challenges, especially where, as here, the prosecutor offers to do so". Thompson, 224 N.J. at 347.

step two, it is undisputed that the prosecutor "prov[ided] a race- or ethnicity-neutral basis supporting [each] peremptory challenge" raised by defendant. Osorio, 199 N.J. at 492. However, defendant contends the trial court failed to conduct the third step of the analysis.

The discussion about Juror No. 197 and Juror No. 375 occurred at the same sidebar. At the end of that sidebar, after hearing the prosecutor's explanations for excusing both jurors, the trial court stated "Okay," and resumed jury selection. At the sidebar addressing Juror No. 893, after hearing the prosecutor's explanation for excusing him, the court stated "All right," and resumed jury selection. It is a reasonable conclusion from the court's statements that the court credited the prosecutor's explanations, found each was "a reasoned, neutral basis for the challenge," and that defendant had failed to "prove[] that the contested peremptory challenge was exercised on unconstitutionally impermissible grounds of presumed group bias." Id. at 492-93.

The record strongly supports this conclusion. First, "the proofs adduced in step one" by defendant were weak. Id. at 429. Defense counsel merely noted Juror No. 197 was African-American and "just ask[ed] for the purposes of the record if there was any other reason" for excusing him.

Defense counsel also proffered: "there was another juror struck that was African-American. The only two that were on the pool." However, the prosecutor referred to his notes and responded that, before Juror No. 197, he had exercised six peremptory challenges against "five white females [and] one Hispanic female." Defense counsel said: "Okay, I thought she was," and reference was made to "Juror number six," referring to a Hispanic-American female who was sitting in the sixth seat in the jury box when the prosecutor excused her earlier.[6] As Juror No. 893 was also African-American and remained in the pool, it appears defense counsel was mistaken in asserting that the prosecutor had excused another African-American potential juror before Juror No. 197. Defense counsel proffered no other evidence concerning the prosecutor's peremptory challenges.

The first-step standard "can be satisfied in various ways," Osorio, 199 N.J. at 504, including:

> (1) that the prosecutor struck most or all of the members of the identified group from the venire; (2) that the prosecutor used a disproportionate number of his or her peremptories against the group; (3) that the prosecutor failed to ask or propose questions to the challenged jurors; (4) that other than their race, the challenged jurors are as

---

[6] That potential juror, Juror No. 883 (sometimes transcribed as 838), testified she "would need fingerprints or very factual information" to convict. No objection has been made to the prosecutor excusing that potential juror.

> heterogeneous as the community as a whole; and (5) that the challenged jurors, unlike the victims, are the same race as defendant.
>
> [State v. Watkins, 114 N.J. 259, 266 (1989) (citing Gilmore, 103 N.J. at 536 (citing Wheeler, 583 P.2d at 764).]

Based on defense counsel's proffer and the striking of Juror No. 197 and Juror No. 893, it can be inferred that the prosecutor excused from the venire the only two African-Americans, who were of the same race as defendant. However, none of the other factors were present. The prosecutor used most of his peremptory challenges (five of nine) on Caucasians, two on Hispanics, and two on African-Americans. Cf. Thompson, 224 N.J. at 346 ("the prosecutor exercised seven of the nine peremptory challenges to strike African Americans"); Osorio, 199 N.J. at 507-08 ("the prosecution's first six peremptory strikes were of members of a minority group"); Gilmore, 103 N.J. at 540 (citing the prosecutor's striking of all seven black jurors in its eleven strikes).

Moreover, the prosecutor proposed questions and the trial court conducted the questioning of the potential jurors.[7] When the court invited follow-up questions regarding Juror No. 893, the prosecutor questioned him about his reading troubles and feelings

---

[7] Before jury selection, the trial court told counsel that they could follow up with "one or two questions," but that the court did not "want a long interrogation."

against the prosecution. The jurors at issue were not heterogeneous, but included a Hispanic-American who was not of the same race as defendant, as well as "both men and women . . . of a variety of . . . occupations, and social or economic conditions." State v. Pruitt, 438 N.J. Super. 337, 340 n.2 (App. Div. 2014) (quoting Wheeler, 583 P.2d at 764). Finally, like defendant, the victim was also African-American, as was Lisa. Cf. Gilmore, 103 N.J. at 536 (stressing it is "'especially'" important if the victim is of the same race as the non-excluded jurors) (citation omitted).

Second, the reasons offered by the prosecutor were strong and undisputed. Defense counsel did not dispute that Juror No. 197 had given the prosecutor a weird smile and then drew his finger across his neck in a slashing motion before questioning began. Cf. Osorio, 199 N.J. at 496-97 (trial counsel contested whether potential jurors high-fived each other). It was also undisputed that such a throat-slashing gesture was a race-neutral and valid reason for striking the juror. State v. Clark, 324 N.J. Super. 558, 571 (App. Div. 1999) (upholding the strike of a potential juror who "refused to look at" the prosecutor); see Wheeler, 583 P.2d at 760-61.

The prosecutor's reasons for striking Juror No. 375 were supported by the record, race-neutral, and valid. Her testimony that she would need scientific or physical evidence to convict

raised a valid concern and was relevant to this case, which lacked any scientific or physical evidence connecting defendant to the crime, and instead was based on eyewitness testimony and testimony about defendant's admissions. See State v. McDougald, 120 N.J. 523, 556 (1990) (upholding strikes of potential jurors who "express[ed] some hesitancy or reluctance to" impose the death penalty).

The prosecutor's reason for striking Juror No. 893 was also supported by the record, race-neutral, and valid. His trouble with reading was plainly relevant to his ability to serve as a juror. N.J.S.A. 2B:20-1 (requiring jurors to "be able to read and understand the English language"). He gave no reason to conclude he would be able to read the written jury instructions required to be given the jury in criminal cases. R. 1:8-8(b)(2). His belief his incarcerated uncle had been treated unfairly by the prosecution raised the concern whether he would decide based on the evidence in this case or bias against the prosecution. See State v. Lewis, 389 N.J. Super. 409, 420 (App. Div. 2007) (upholding the strike of a potential juror whose husband had received a sentence she "believed was excessive").

"In order to rebut the defendant's prima facie case, the prosecution's justifications of its peremptory challenges need not rise to the level justifying challenges for cause." Gilmore, 103

15

N.J. at 538. "'[T]here are any number of bases on which a party may believe, not unreasonably, that a prospective juror may have some slight bias that would not support a challenge for cause but that would make excusing him or her desirable.'" Ibid. (citation omitted).

Here, the prosecutor's reasons were strong and reached or approached the level justifying a challenge for cause. Moreover, they were all "'reasonably relevant to the particular case on trial or its parties or witnesses.'" Ibid. (citation omitted). The evidence supported that the prosecutor's explanations were "genuine and reasonable grounds for believing that potential jurors might have situation-specific biases that would make excusing them reasonable and desirable," and there was no indication they were "'sham excuses belatedly contrived to avoid admitting acts of group discrimination.'" Osorio, 199 N.J. at 504-05 (quoting Gilmore, 103 N.J. at 537-38).

Third, the strong reasons offered by the prosecutor in step two outweighed the weak proffer by the defendant in step one. Defendant does not contend the trial court should have found it inappropriate to strike Juror No. 197 after he made the slashing gesture across his throat, or to strike Juror No. 893 because he could not read the written jury instructions and believed the prosecutor's office had unfairly imprisoned his uncle. The valid

16

reasons for striking those two African-American potential jurors defeated defendant's step-one proffer that the prosecutor has stricken the two African-Americans in the jury pool.

Fourth, defendant did not contest the credibility, validity, or adequacy of the prosecutor's reasons. After the prosecutor stated his reasons, defendant made no proffer and voiced no complaint, either during jury selection, at the conclusion of jury selection, or in a motion during or after trial. Nor did defendant ever request any of the various forms of relief available. See State v. Andrews, 216 N.J. 271, 293 (2013).

On appeal, defendant contends that the trial court should have invalidated the striking of the Hispanic-American prospective juror. He argues the court should have found the prosecutor's reasons were invalid because Juror No. 375 said "Yes" when asked: "Could you follow my instructions as to the law in the case and apply that law to the facts that you find?" However, she already testified that she would not find facts based solely on testimony, that there would have to be scientific evidence, and that she did not know whether she could convict without physical evidence. Her answer to a question that did not mention testimonial, scientific, or physical evidence did not contradict let alone negate her earlier testimony. Even if she had contradicted her earlier testimony, the prosecutor would not have been required to credit

A-5494-14T1

such a denial, but could strike her rather than take the chance she would not fairly consider his testimonial case.

Defendant also argues on appeal that there was no evidence "whether the State has applied the proffered reasons 'even-handedly to all prospective jurors'; the 'overall pattern' of the use of peremptory challenges; and 'the composition of the jury ultimately selected to try the case.'" Thompson, 224 N.J. at 343 (quoting Osorio, 199 N.J. at 506). However, our Supreme Court in Thompson made clear that "[t]his analysis presumes that a defendant will present information beyond the racial makeup of the excused jurors." Id. at 348. "Nothing in Gilmore or Osorio placed the onus on the court to comb the record for instances where a juror selected provided answers similar to the reasons the State proffered for its use of a peremptory challenge; it is the defendant's obligation to do so." Id. at 349. Here, as in Thompson, the "failure of defendant to counter any of the prosecutor's suggestions or raise an 'uneven application' argument made it impossible for the court to 'include in its findings any of the third-step considerations' outlined in Osorio." Id. at 350; see Pruitt, 438 N.J. Super. at 344.

Even now, defendant does not point to any juror who made a similar unsettling gesture as Juror No. 197, had difficulty reading and felt the prosecutor's office was unfair like Juror No. 893,

18

or demanded scientific or physical evidence like Juror No. 375, and yet was seated. Our review of the transcripts reveals no such jurors. All potential jurors who initially expressed some concern about convicting based on only testimonial evidence either were excused, or in subsequent questioning expressly testified they could do so.[8]

In sum, there was ample evidence that the prosecutor had offered a credible, "reasoned, neutral basis for [each] challenge," and that defendant had failed to "prove[] that the contested peremptory challenge was exercised on unconstitutionally impermissible grounds of presumed group bias." Osorio, 199 N.J. at 492-93. That strong evidence rebutted defendant's weak prima facie offering, and defendant offered the trial court no evidence, argument, or complaint to the contrary. The trial court's statements "Okay" and "All right" after the prosecutor gave his reasons, and its resumption of jury selection, showed the court credited the prosecutor's non-discriminatory reasons and rejected any claim of discrimination. "'[I]f . . . the trial court believes the prosecutor's nonracial justification, and that finding is not clearly erroneous, that is the end of the matter.'" Thompson, 224 N.J. at 340 (citation omitted).

---

[8] One juror clarified that her concern was about convicting for murder if no body had been found, which was not the case here.

Nonetheless, the trial court's statements "Okay" and "All right" were not what we or the Supreme Court had in mind when we described the third-step findings. "[T]he trial court must make specific findings with respect to the . . . proffered reasons for exercising any disputed challenges. . . . Moreover, it is essential that separate findings be made with respect to each disputed challenge." Osorio, 199 N.J. at 506 (quoting State v. Clark, 316 N.J. Super. 462, 473-74 (App. Div. 1998)). However, for the reasons set forth above, defendant was not prejudiced by the lack of more specific findings.

As there was no evidence that the prosecution's strikes of the three potential jurors were improper, there was no evidence he was denied "the right to trial by an impartial jury drawn from representative cross-section of the community." Gilmore, 103 N.J. at 543. A denial of the cross-section requirement "may not be treated as harmless error." Id. at 544. However, the lack of more detailed findings, without more, is not such a denial, and "a cross-section violation should not be assumed." State v. Timmendequas, 161 N.J. 515, 665 n.8 (1999). "Although a violation of the cross-section requirement is not subject to a harmless error analysis, other constitutional violations with the potential to lead to a cross-section violation often will be" harmless. Ibid. Here, the lack of specific findings is harmless.

"Therefore, reversal and remand for a new trial [i]s not appropriate." See Thompson, 224 N.J. at 337-38, 350 (reversing our ruling that a trial court failed to conduct a third-step analysis).

## III.

Defendant makes other claims of trial error, but he did not object to those alleged errors, and thus he must show plain error. Under the plain error standard, "defendant has the burden to show that there is an error, that the error is 'clear' or 'obvious,' and that the error has affected 'substantial rights.'" State v. Chew, 150 N.J. 30, 82 (1997) (quoting, and ruling "[o]ur law is the same" as, United States v. Olano, 507 U.S. 725, 734 (1993)). An error is not clear or obvious "unless the error is clear under current law" at the time of appellate consideration. Olano, 507 U.S. at 734; see Henderson v. United States, 568 U.S. 266, 279 (2013); Johnson v. United States, 520 U.S. 461, 468 (1997). To show an effect on substantial rights, defendant has the burden of proving the error was "clearly capable of producing an unjust result." R. 2:10-2.

### A.

Defendant claims on appeal that the video recording of the photo array procedure was not an identification under N.J.R.E. 803(a)(3), and thus was improperly admitted at trial.

"[C]onsiderable latitude is afforded a trial court in determining whether to admit evidence, and that determination will be reversed only if it constitutes an abuse of discretion." State v. Kuropchak, 221 N.J. 368, 385 (2015) (citation omitted). Moreover, defendant did not object to the admission of the video at trial, so he must show plain error.[9]

N.J.R.E. 803(a) provides that the hearsay rule does not exclude "[a] statement previously made by a person who is a witness at a trial" that "is a prior identification of a person made after perceiving that person if made in circumstances precluding unfairness or unreliability." N.J.R.E. 803(a), (a)(3). "Prior identifications are admissible because, being made when the events and sensory impressions are fresh in the mind of a witness, they are likely to be correct." State v. Matlack, 49 N.J. 491, 498 (1967). If the person making the identification is a witness at trial, that person's testimony, third-party testimony, and exhibits recording the identification are all admissible. Id. at

---

[9] Defendant did not raise N.J.R.E. 803(a)(3) at the pretrial Wade hearing. See United States v. Wade, 388 U.S. 218 (1967). "A Wade hearing is required to determine if the [police] identification procedure was impermissibly suggestive and, if so, whether the identification is reliable." State v. Micelli, 215 N.J. 284, 288 (2013). The motion judge rejected defendant's claim that the detective was suggestive by putting defendant's photo off to the side face up while Ruiz was looking at the next photo. Defendant does not renew that Wade claim on appeal.

499-500; see State v. Lazo, 209 N.J. 9, 25 (2012) (admitting a composite sketch).

Defendant contends Ruiz did not make any identification on the video. However, the video recorded Ruiz as looking at defendant's photo and saying "[t]hat looks something like him," referring to the shooter. Ruiz repeatedly said "That looked like him right there." He reiterated: "That look like him right there, but he didn't have no Afro"; and that "look something like him because his eyes."

"Testimony that a defendant looks like or resembles the person observed by the witness, or is of the same size or general appearance, or has physical features fairly close to the accused is competent and may be sufficient when considered with the other evidence." State v. Lutz, 165 N.J. Super. 278, 291 (App. Div. 1979); accord State v. Swed, 255 N.J. Super. 228, 247 (App. Div. 1992). Here, there was other evidence, particularly Harris' positive identification of defendant.

Defendant notes the detectives marked Ruiz as having made "no identification," but they also marked that Ruiz had said defendant's photo resembled the shooter. In any event, "[t]he prior identification need not be unequivocal to be admissible[.]" Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, comment 3 on N.J.R.E. 803(a) at 846 (2018) (citing Lutz and Swed); see

Swed, 255 N.J. Super. at 247 (admitting a "somewhat tenuous" identification). In Lutz, the witness "could not definitely identify any of the photographs" in the photo array. 165 N.J. Super. at 287. We reversed a ruling that "no identification" had been made, and we ruled the witness's

> testimony was not so utterly lacking in probative value as to require the trial judge to reject it as a matter of law. It is true that the witness was uncertain at the photographic displays and could not make an unequivocal identification of defendant. But the lack of a "positive" identification did not invalidate her testimony in its entirety. An identification can be absolute or qualified . . . . The lack of certainty on the part of the identifying witness, or the indefiniteness of the identification, goes to the weight to be given the testimony and to its credibility. These are matters for the jury to resolve, not the judge.
>
> [Id. at 290 (citations omitted).]

Defendant also cites alleged denials by Ruiz on the video which appears in the transcript of the pretrial Wade hearing but not of the trial. Even assuming we can consider the earlier transcript, we reject defendant's claim of trial error. He cites Ruiz's comment on the video that even though defendant's face resembled the shooter's face, "he didn't have no Afro, so that wasn't him." However, Ruiz's observation of the facial resemblance remained relevant and admissible even if he could not positively identify defendant because the haircut differed. Defendant also

24

cites Ruiz's comment: "That ain't him. He had dark tone, none of them have dark tone." It is unclear from either transcript which photo(s) Ruiz was referencing, and defendant failed to supply us with the video. In any event, the resemblance in facial features was still relevant and admissible.

Ruiz testified that the photo of defendant with his hair in an Afro in the photo array "looked close" and "look[ed] something like him with an Afro, but he didn't have no Afro." Defendant had the opportunity to cross-examine Ruiz regarding the prior identification on the video. Its admission was not an abuse of discretion, let alone plain error. "The worth thereof was for the fact finder, not for the court," to determine. State v. Farrow, 61 N.J. 434, 452 (1972).

B.

Defendant argues on appeal that the prosecutor improperly commented on Ruiz's prior identification in his closing argument. "[W]hen counsel does not make a timely objection at trial, it is a sign 'that defense counsel did not believe the remarks were prejudicial.'" State v. Pressley, 232 N.J. 587, 593-94 (2018) (citations omitted).

The prosecutor argued that when Ruiz was shown the photo array,

25

he could not make a positive identification of the shooter, but remember what he did on photo number 3, of all of the photos that were shown to him, eight different photos, he stopped at number 3, and he basically said — and you saw the video — nah, yeah, that's him, no, that's not him, and he kind of waffled back and forth, said he couldn't be for sure.

But what he did do, I suggest to you, same day as the incident, is gave a partial identification of the defendant in photo number 3. . . .

And what he did was says [sic] that's the guy, looks like him, he has the same eyes. Of all the eight photographs, which one does he kind of pick? He picks photo number 3, the defendant.

Defendant now claims the phrases "partial identification" and "kind of pick[ing]" defendant's photo misrepresented Ruiz's testimony. However, those phrases, particularly in the context of the prosecutor's entire argument, reflected and were "reasonably related" to Ruiz's statements and actions on the video. Id. at 593 (citation omitted). Moreover, the trial court repeatedly instructed the jury that the "arguments, statements, remarks, openings and summations of counsel are not evidence and must not be treated as evidence," and that the jurors "must rely solely on [their] understanding and recollection of the evidence." "We presume the jury followed the court's instruction." State v. Smith, 212 N.J. 365, 409 (2012)). Defendant fails to show plain error, as he cannot show the prosecutor's argument was "'clearly

26

and unmistakably improper' and 'so egregious' that it deprived defendant of the 'right to have a jury fairly evaluate the merits of his defense.'" Pressley, 232 N.J. at 593-94 (citation omitted).

IV.

Defendant must also show plain error regarding his two claims of omissions from the trial court's final charge. At the charge conference, defense counsel told the court she did not "have any comments regarding the proposed charge," that the proposed instructions she submitted "appear to be all covered" in the court's proposed charge, and she "didn't have any changes." Moreover, defendant did not object at the court's charge as delivered.

Courts "review for plain error the trial court's obligation to sua sponte deliver a jury instruction when a defendant does not request it and fails to object at trial to its omission." State v. Alexander, 233 N.J. 132, 141-42 (2018). Moreover, "[d]efendant's failure to 'interpose a timely objection constitutes strong evidence that the error belatedly raised here was actually of no moment.'" State v. Tierney, 356 N.J. Super. 468, 481 (App. Div. 2003) (citation omitted). Where there is no objection, "there is a presumption that the charge . . . was unlikely to prejudice the defendant's case." State v. Singleton, 211 N.J. 157, 182 (2012).

A.

Defendant complains on appeal that the trial court did not sua sponte give the <u>Model Jury Charge (Criminal)</u>, "Testimony of a Cooperating Co-Defendant or Witness" (rev. Feb. 6, 2006) (<u>Cooperating Charge</u>). However, the <u>Cooperating Charge</u> explicitly warns:

> This charge should not be given except upon the request of defense counsel. "While a defendant is entitled to such a charge if requested and a judge may give it on his own motion if he thinks it advisable under the circumstances, it is generally not wise to do so absent a request, because of the possible prejudice to the defendant." <u>State v. Begyn</u>, 34 N.J. 35, 54-56 (1961); <u>State v. Gardner</u>, 51 N.J. 444, 460-461 (1968). "Certainly, it is not error, let alone plain error, for a trial judge to fail to give this cautionary comment where it has not been requested." <u>State v. Artis</u>, 57 N.J. 24, 33 (1970).
>
> [<u>Id.</u> at 1 n.1.]

Defendant points out that the cited cases concern situations where the cooperating witnesses are accused of committing a crime with the defendant, where the instruction might "convey[] to the jury an impression that the court is suggesting his guilt solely because the witnesses have admitted theirs and implicated him." <u>Begyn</u>, 34 N.J. at 55. Nonetheless, defendant cannot show prejudice.

Defendant argues the trial court should have sua sponte given the portion of the charge stating:

> The law requires that the testimony of such a witness be given careful scrutiny. In weighing his/her testimony, therefore, you may consider whether he/she has a special interest in the outcome of the case and whether his/her testimony was influenced by the hope or expectation of any favorable treatment or reward, or by any feelings of revenge or reprisal.
>
> [Cooperating Charge at 2].

Defendant was not prejudiced because the trial court's final charge allowed the jury to consider those factors. It instructed the jury "to determine the credibility of the witness[], and in determining whether a witness is worthy of belief," to consider "the witness' interest in the outcome of the trial," the witness's "possible bias, if any, in favor of the side for whom the witness testified," and "any and all other matters in the evidence which serve to support or discredit [the witness's] testimony." See Artis, 57 N.J. at 33 (finding no plain error where "the court did charge that, in determining the credibility of witnesses, the jury should take into account the interest of a witness in the outcome of the trial").

Even if "the trial court should have instructed the jury to carefully scrutinize [the cooperating witness's] testimony," our Supreme Court has found no plain error where "defense counsel

thoroughly cross-examined [the witness] to challenge his credibility and [his] lack of credibility was a major theme in closing arguments," and "the trial court gave the standard charge on credibility." State v. Adams, 194 N.J. 186, 208-09 (2008). Given such extensive impeachment, "[i]t was obvious to any juror that [the cooperating witness] was a witness whose testimony called for careful scrutiny. The absence of the benefit to defendant of the court's imprimatur on his argument through the accomplice-credibility instruction was not clearly capable of producing an unjust result." State v. Harris, 156 N.J. 122, 182 (1998).

Defense counsel repeatedly attacked the testimony of the cooperating witness, Alford. She cross-examined him thoroughly on his criminal history, his pending charges, the benefits of cooperating, and his motives for testifying. In closing, she pointed out "his endless rap sheet," "his steal of a deal of five years . . . based on his cooperating agreement instead of 20 years that he was facing," and his knowledge that he could "get bigger points" for implicating defendant for "bigger crimes like murder." She argued Alford took what defendant was alleged to have done and lied that he had confessed to doing it. She told the jurors she was "fully confident that you do not need me to" talk further about that "quote/unquote 'witness.'" Moreover, there was other eyewitness testimony that defendant committed the shooting. Thus,

any error was not "sufficiently prejudicial to require a reversal." Begyn, 34 N.J. at 56.

B.

Defendant argues that in light of his oral statements to Alford, the trial court sua sponte should have given the instructions described in [1] State v. Kociolek, 23 N.J. 400 (1957), and [2] State v. Hampton, 61 N.J. 250 (1972), respectively:

> [1] In considering whether or not an oral statement was actually made by the defendant, and, if made, whether it is credible, you should receive, weigh and consider this evidence with caution based on the generally recognized risk of misunderstanding by the hearer, or the ability of the hearer to recall accurately the words used by the defendant. . . . [2] If, after consideration of all these factors, you determine that the statement was not actually made, or that the statement is not credible, then you must disregard the statement completely.
>
> [Model Jury Charge (Criminal), "Statements of Defendant," 1-2 (rev. June 14, 2010) (numeration added).]

However, there was "no plain error in the omission of Hampton and Kociolek charges," because "the jury was made well aware of the questions surrounding the reliability of defendant's alleged statements to" Alford by defense counsel's cross-examination and closing, and received the trial court's "detailed credibility instruction that sufficiently guided the jury in assessing [Alford's] testimony." State v. Feaster, 156 N.J. 1, 72-73 (1998).

31

Indeed, there is "no reported case in which a failure to include a <u>Kociolek</u> charge has been regarded as plain error." <u>State v. Crumb</u>, 307 N.J. Super. 204, 251 (App. Div. 1997). Moreover, a <u>Hampton</u> instruction is designed to address "police interrogation" and "is not required when a defendant has allegedly made a voluntary inculpatory statement to a non-police witness without being subjected to any form of physical or psychological pressure." <u>State v. Baldwin</u>, 296 N.J. Super. 391, 398 (App. Div. 1997); <u>see</u> <u>State v. Wilson</u>, 335 N.J. Super. 359, 367 (App. Div. 1999). Here, the absence of those instructions "was not clearly capable of producing an unjust result." <u>State v. Harris</u>, 156 N.J. 122, 183 (1998).

## V.

Lastly, defendant challenges his sentence. "Appellate review of sentencing is deferential, and appellate courts are cautioned not to substitute their judgment for those of our sentencing courts." <u>State v. Case</u>, 220 N.J. 49, 65 (2014) (citation omitted). A sentence must be affirmed unless: "(1) the trial court failed to follow the sentencing guidelines, (2) the aggravating and mitigating factors found by the trial court are not supported by the record, or (3) application of the guidelines renders a specific sentence clearly unreasonable." <u>State v. Carey</u>, 168 N.J. 413, 430 (2001). None of those failings occurred here.

The trial court sentenced defendant for second-degree manslaughter to an extended-term sentence of fourteen years in prison with an 85% period of parole ineligibility under the No Early Release Act, N.J.S.A. 2C:43-7.2. The court merged into that conviction defendant's conviction for second-degree possession of a firearm for an unlawful purpose. For second-degree unlawful possession of a handgun without a permit, the court imposed a consecutive sentence of six years in prison with a three-year period of parole ineligibility. Both sentences were consecutive to defendant's four years in prison for violation of probation.

Defendant argues his extended-term sentence was excessive. The trial court imposed the extended-term sentence because defendant was a persistent offender under N.J.S.A. 2C:44-3(a), as he had "been previously convicted on at least two separate occasions of two crimes, committed at different times." Before his November 2011 manslaughter offense, he had been convicted of a January 2011 third-degree aggravated assault involving significant bodily injury against Simpson under Indictment No. 11-06-1382.[10] Defendant also had been convicted in Georgia of a 2001 theft by receiving stolen property offense, which defense counsel conceded was the equivalent of an indictable offense. Defendant

_____

[10] Defendant included this indictment in his amended notice of appeal, but makes no belated challenge to that conviction.

did not dispute his eligibility for an extended term of up to twenty years in prison.

Defendant also had been convicted of disorderly-persons simple assault in April 2011. He violated the probation he received for his aggravated assault against Simpson by fatally shooting Simpson. The trial court found three aggravating factors and no mitigating factors. The court gave heavy weight to aggravating factors three and nine and moderate weight to aggravating factor six. See N.J.S.A. 2C:44-1(a)(3), (6), (9). Under these circumstances, defendant fails to show the fourteen-year extended-term sentence was an abuse of discretion.

Defendant contends the trial court abused its discretion in making his unlawful possession sentence consecutive to his manslaughter sentence. However, the court made clear it was guided by the factors in State v. Yarbough, 100 N.J. 627 (1985). The court noted "there can be no free crimes in a system for which the punishment shall fit the crime." Id. at 643. The court found two other Yarbough factors favored a consecutive sentence: "the crimes and their objectives were [not] predominantly independent of each other," and "the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior." Id. at 644. The court found defendant committed the crimes at

34

different times and places, because he possessed the gun without a permit "before the [manslaughter] offense" as he came from his apartment with the gun, and he possessed the gun without a permit after the manslaughter offense because he "fled with the weapon." The court thus found defendant's possession of the gun without a permit was "a separate offense." The court "weigh[ed] the Yarbough factors" and made the unlawful possession sentence consecutive.

The trial court's findings were supported by the evidence, particularly defendant's statements to Alford that he took the gun to Chicago when he fled. Moreover, as Judge (later Justice) Long stated, "[i]t is well-settled that [unlawful possession of a handgun without a permit] is an offense separate and apart from" a substantive offense committed with the gun. State v. Cooper, 211 N.J. Super. 1, 22 (App. Div. 1986).[11] Thus, the court did not violate "the criteria for imposing consecutive sentences enunciated in State v. Yarbough" in imposing a consecutive sentence

---

[11] Our Supreme Court has relied on Cooper to hold that unlawful possession of a handgun under N.J.S.A. 2C:39-5(b) does not merge into possession of a firearm for an unlawful purpose under N.J.S.A. 2C:39-4(a). State v. O'Neill, 193 N.J. 148, 163 n.8 (2007) (citing Cooper, 211 N.J. Super. at 22-23); see State v. Garcia, 195 N.J. 192, 200 n.4 (2008). Similarly, "[b]ecause the gravamen of unlawful possession of a handgun is possessing it without a permit, it does not merge with a conviction for a substantive offense committed with the weapon." State v. DeLuca, 325 N.J. Super. 376, 392-93 (App. Div. 1999), aff'd o.b., modified on other grounds, 168 N.J. 626, 631 (2001).

for unlawful possession of a handgun without a permit.  State v. Lane, 279 N.J. Super. 209, 222 (App. Div. 1995).

We note State v. Copling, 326 N.J. Super. 417 (App. Div. 1999), held that a "conviction for unlawful possession must be served concurrently to the conviction for murder."  Id. at 442. Copling ruled the sentencing court could not justify a consecutive sentence based on the different "'objectives and purposes'" of the unlawful possession of a handgun statute and the murder statute. Id. at 441.  Copling reasoned "the objective of each [statute] is similar," and "the victims sought to be protected by the two statutes are the same."  Id. at 441-42.

Copling is distinguishable because the trial court here did not rely on the different objectives and purposes of N.J.S.A. 2C:39-5(b) and the manslaughter statute, and properly found Yarbough factors supporting a consecutive sentence.  In any event, Copling's reasoning is unpersuasive.  The offense of unlawful possession of a handgun without a permit is part of New Jersey's gun control laws designed to regulate the possession of handguns "without regard to the individual's intent or purpose in possessing them," and regardless of whether the gun is used to commit another crime.  State v. Harmon, 104 N.J. 189, 197 (1986).  Those objectives and purposes are different than the purpose of the

manslaughter statute to deter and punish unlawful homicides against individual victims regardless of the fatal means used.

Defendant notes the crimes did not involve "separate acts of violence or threats of violence," or "multiple victims." Yarbough, 100 N.J. at 644. However, "a sentencing court may impose consecutive sentences even though a majority of the Yarbough factors support concurrent sentences." Carey, 168 N.J. at 427-28 (citing State v. Perry, 124 N.J. 128, 177 (1991) (finding consecutive sentences proper even though four of Yarbough's five factors favored concurrent sentences)). Thus, "[w]e cannot conclude that the trial court abused its discretion by imposing consecutive sentences." State v. Spivey, 179 N.J. 229, 245 (2004).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION